Charlotte McDOWELL, Plaintiff,

v.

SAFEWAY STORES, INCORPORATED, Defendant,

Retail Clerks Union Local 1583, Third-Party Defendant,

John Nimmer, Carmen Smith, Cheryl Russ, Linda Nowden, Gwendolyn Doby, and James King, Intervenors.

No. LR–C–80–52.

United States District Court, E.D. Arkansas, W.D.

Nov. 29, 1983.

John W. Walker, Ralph M. Washington, Little Rock, Ark., for plaintiff.

Phillip K. Lyon, Scotty Shively, and Russell A. Gunter, Little Rock, Ark., for defendant.

Youngdahl & Larrison, Little Rock, Ark., for third-party defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

*The Pleadings*

WOODS, District Judge.

1. Charlotte McDowell, the Plaintiff herein, filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on April 9, 1979 alleging that Safeway had discriminated against her on the basis of her race. McDowell did not file a charge of discrimination with the EEOC against the Retail Clerks Union Local 1583. Before the EEOC had an opportunity to make a determination of McDowell's charge, McDowell asked for and received a Right-to-Sue Notice.

2. On January 30, 1980 Plaintiff McDowell filed the instant lawsuit against Safeway alleging that Safeway had illegally discriminated against her individually because of her race, and against all blacks as a class, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. (Title VII), and 42 U.S.C. § 1981 (§ 1981). This suit was filed only against Safeway. The Retail Clerks Union was not named as a defendant. McDowell was a member of the Retail Clerks Bargaining Unit at all relevant times.

3. The complaint alleged disparate treatment of McDowell individually and disparate treatment of blacks as a class. There are no specifically identified or identifiable allegations of disparate impact in the complaint, nor were any raised at any time during the pendency or trial of this lawsuit.

4. The relevant time period for finding of liability under Title VII would be from October 10, 1978 (180 days prior to the filing of McDowell's EEOC charge) to the present. The relevant time period for finding of liability under § 1981 is from Janu-

ary 30, 1977 (3 years prior to the filing of this lawsuit).

5. McDowell is the only original Plaintiff in this lawsuit. Her individual allegations of race discrimination are that she was discharged because of her race and that she was denied entry into Safeway's Store Management Training Program (SMTP) because of her race.

6. On May 23, 1980 James King filed a Petition for Intervention into this lawsuit. King was allowed to intervene by Order of Court on June 17, 1980. King alleged in his petition for intervention that Safeway had illegally discriminated against him in that he was denied a transfer to a truck driving position because of his race, and that he was denied a promotion to heavy duty mechanic because of his race. King is employed in Safeway's Distribution Center and at all relevant times has been a member of the Teamsters Local 878 Bargaining Unit. King did file an EEOC charge against Safeway but did not file an EEOC charge against the Teamsters Union.

7. On May 23, 1980 Carmen Smith filed a Petition for Intervention into this lawsuit. Smith was allowed to intervene by Order of Court on July 14, 1980. Smith alleged in her Petition for Intervention that Safeway had illegally discriminated against her in that she was not properly trained because of her race and that she was discharged because of her race.

8. On July 15, 1980 John Nimmer filed a petition for intervention into this lawsuit. Nimmer was allowed to intervene by Order of Court on August 18, 1980. Nimmer alleged in his Petition for Intervention that Safeway had illegally discriminated against him in that he was not properly trained as a Store Management Trainee because of his race, and that he was demoted from Store Management Training Program because of his race. Nimmer is employed in Safeway's retail stores and at all relevant times has been a member of the Retail Clerks Bargaining Unit. Nimmer filed an EEOC charge against Safeway but did not file an EEOC charge against the Retail Clerks Union.

9. On July 2, 1981 Gwendolyn Doby filed a Petition for Intervention into this lawsuit. Doby was allowed to intervene by Order of Court on October 8, 1981. Doby alleged in her Petition for Intervention that Safeway had illegally discriminated against her in that she was reprimanded because of her race, was given more difficult job assignments because of her race, was not transferred because of her race, and was assigned fewer working hours because of her race. Doby was employed in one of Safeway's retail stores and was a member of the Retail Clerks Bargaining Unit. Doby filed an EEOC charge against Safeway but did not file an EEOC charge against the Retail Clerks Union.

10. On July 2, 1981 Linda Nowden filed a Petition for Intervention into this lawsuit. Nowden was allowed to intervene by Order of the Court on October 8, 1981. Nowden alleged in her Petition for Intervention that Safeway had illegally discriminated against her in that she was denied full-time status because of her race and that she was reduced from full-time status because of her race. Nowden is employed in Safeway's retail stores and has been, at all relevant times, a member of the Retail Clerks Bargaining Unit. Nowden filed an EEOC charge against Safeway and the Retail Clerks Union. However, prior to filing her Petition to Intervene, she dropped her charge against the Union.

11. On July 2, 1981 Cheryl Russ filed a Petition for Intervention into this lawsuit. Russ was allowed to intervene by Order of Court on October 8, 1981. Russ alleged in her petition for intervention that Safeway had illegally discriminated against her in that she was denied promotions because of her race and that she was denied certain hours of work because of her race. Russ was employed in one of Safeway's retail stores and was a member of the Retail Clerks Bargaining Unit. Russ filed an EEOC charge against Safeway but did not file an EEOC charge against the Retail Clerks Union.

12. On November 10, 1981 Marion King filed a petition for intervention into this

lawsuit. King alleged in his petition for intervention that Safeway had illegally discriminated against him in that he was discharged as a Store Manager for Safeway because of his race. King was employed as a Store Manager in Safeway's retail stores but was not a member of the Retail Clerks Bargaining Unit. King filed an EEOC charge against Safeway, but did not file a charge against the Retail Clerks Union. On January 5, 1982 King was denied intervention into this lawsuit on the grounds that the intervention of a store manager would unduly delay the trial of this matter and unduly broaden the scope of this lawsuit. King subsequently filed a separate lawsuit against Safeway.

13. On February 23, 1982 the Court approved a Stipulated Order agreed upon by the parties setting forth the definition of a class and the delineation of the class issues. (Hereinafter, Stipulated Order).

14. The stipulated class was defined as "all black employees of Defendant, Safeway Stores, Inc., whether full-time or part-time, employed in Defendant Safeway's Pulaski County stores at any time since January 30, 1977, who were members of the bargaining unit represented by the Defendant's Retail Clerks Union, Local No. 1583 and who may have been subjected to racially discriminatory treatment by Defendant Safeway in violation of 42 U.S.C. § 1981.

15. The class issues involved in this lawsuit were delineated as follows:

(a) Black employees being denied promotions or the opportunity to be promoted because of their race. A promotion is defined as the movement from one job classification within a bargaining unit to a different job classification within the bargaining unit with a higher rate of pay.

(b) Black employees being denied full-time employment status because of their race, specifically involving, (1) white part-time employees being given full-time status before black part-time employees with greater seniority; (2) white employees being given full-time status when initially hired while black part-time employees were denied full-time status; and (3) black full-time employees being reduced from full-time to part-time status before white full-time employees with less seniority.

(c) Black part-time employees being assigned fewer hours to work per week than white part-time employees with less seniority.

(d) Black employees being denied promotion, reclassification to full-time status and more hours of work because of their race in that such promotion, reclassifications and hours of work are given to white persons who have less seniority and are relatives of white officials, managers and other employees of Safeway.

(e) Black employees being discharged because of their race.

(f) Black employees being subjected to discriminatory treatment with regard to Safeway Store Management Training Program, specifically involving, (1) being denied proper training and being subjected to adverse treatment on the basis of race; (3) after entry into the program, being demoted or discharged from the program on the basis of race.

(g) Black employees subjected to discriminatory working conditions which can be remedied only through injunctive and declaratory relief including, (1) being assigned the least desirable shifts; (2) being subjected to racial harassment, racial epithets and racial jokes; (3) being given more onerous and difficult work assignments than white employees." (Stipulated Order).

16. The parties stipulated that Intervenor James King was not a class representative, but that King would continue to prosecute and try his individual claims of racial discrimination at the Safeway Distribution Center. (Stipulated Order).

17. The parties stipulated that the Stipulated Order constituted the complete cer-

tification of all class issues in this lawsuit except for the issue of whether the Plaintiff and Intervenors, all of whom had been hired by Safeway, could adequately represent a class of applicants who had not been hired by Safeway. This issue was submitted to the Court on the briefs of the parties. By order dated March 11, 1982 the Court denied the Plaintiff and Intervenor's request to represent a class of applicants because of failure to satisfy the typicality, commonality and adequacy of representation requirements of Rule 23 of the Federal Rules of Civil Procedure.

18. The Retail Clerks Union, Local 1583, was not named as a defendant when the instant suit was filed on January 30, 1980.

19. Defendant, Retail Clerks Union, Local 1583, has been the exclusive bargaining representative for all nonsalaried employees, excluding meatcutters, employed in the retail stores throughout the Little Rock Division, since approximately 1959. The meatcutters are covered by a separate contract with a separate union and are not included in this litigation. The Retail Clerks Union and Safeway have negotiated a series of collective bargaining agreements covering the various bargaining units within the Little Rock Division. The employees and all of the retail stores in Pulaski County constitute one bargaining unit. The terms and conditions of employment of the employees in the Pulaski County Bargaining Unit have been set forth in a series of collective bargaining agreements between Safeway and the Retail Clerks Union. (Jt.Exh. 1, Stip. 12).

20. The Retail Clerks Contract contains certain provisions governing the following employment practices:

(a) Reclassification from part-time to full-time status;

(b) Reclassification from full-time to part-time status;

(c) Employees hired into full-time status;

(d) Scheduling of hours and shifts of part-time employees;

(e) Promotions;

(f) Rates of pay for any given classification in the bargaining unit; and

(g) Discharges.

(Jt.Exh. 1, Stip. 16, 26, 27; Def.Exh. 11, 12, 13).

21. If any employee believes that he or she has been wrongfully denied any right granted to the employee under the Retail Clerks Contract with regard to part-time and full-time status, scheduling of hours or shifts, promotions, rates of pay, or discharge, the employee may file a grievance with the Retail Clerks Union. The Retail Clerks contract provides for binding arbitration of such grievances. (Jt.Exh. 1, Stip. 26; Def.Exh. 11, 12, 13). However, probationary employees do not have any access to the grievance provisions of the Union contract.

22. Although the Retail Clerks Union was not named as a defendant when the instant lawsuit was filed on January 30, 1980, Plaintiff, McDowell and Intervenors, James King, Carmen Smith and John Nimmer filed a Motion with the Court to join the Retail Clerks Union as an indispensable party, alleging that there could not be adequate adjudication of the issues without the Retail Clerks Union as a party defendant.

23. By Order of the Court on July 2, 1981, the Court found the Union to be a necessary party. The Court further found that the Retail Clerks Union could not be joined in the Plaintiff's Title VII action because of the failure of any Plaintiff or Intervenor to file an EEOC charge against the Retail Clerks Union. The Court then found the Union to be an indispensable party, particularly for remedy purposes, and thus dismissed the Title VII claims of the Plaintiff for failure to join an indispensable party. However, the Court then ordered the Retail Clerks Union to be joined as a Defendant in the Plaintiff and Intervenor's § 1981 cause of action. On October 8, 1981 Intervenors Doby, Nowden and Russ were permitted to intervene in the § 1981 case against both Defendants.

24. On a joint motion of all parties, the Court ordered the bifurcation of the trial into a liability phase and a remedy phase.

The Retail Clerks Union did not participate in the liability phase of the trial.

25. Defendant Safeway is a Maryland corporation duly licensed to do business in the State of Arkansas. (Jt.Exh. 1, Stip. 6).

26. The Little Rock Division of Safeway encompasses all of the State of Arkansas, and portions of Texas, Louisiana, Mississippi, Tennessee and Missouri. (Jt.Exh. 1, Stip. 7).

27. The Little Rock Division office is located in Little Rock, Arkansas. The Little Rock Division is responsible for all retail grocery stores located throughout the Division and for the Distribution Center located in Little Rock, Arkansas. (Jt.Exh. 1, Stip. 8).

28. The Little Rock Division Manager is in charge of the entire Little Rock Division. The Retail Operations Manager is responsible for all retail grocery stores in the Little Rock Division and reports directly to the Division Manager. The Distribution Center Manager is in charge of the Distribution Center and reports directly to the Division Manager. (Jt.Exh. 1, Stip. 9).

29. The retail grocery stores under the supervision of the Retail Operations Manager are divided into districts. Each district has a District Manager that reports directly to the Retail Operations Manager. The Store Manager within each district reports directly to the District Manager. (Jt. Exh. 1, Stip. 10). The Little Rock Division is divided into five districts of 12 to 13 stores per district. Four of the five districts are pie shaped out of the City of Little Rock. The four District Managers for those districts are officed in Little Rock. One district is located away from Little Rock, in northern Louisiana. The District Manager for that district is officed in Monroe, Louisiana. Districts have been drawn in a pie shape out of Little Rock so that as many District Managers as possible could be officed in the Little Rock Division office. Also, the travel time for the District Managers is equalized by having each of the four District Managers officed in Little Rock having some stores in the Little Rock area (including Benton) and out of the Little Rock area. (Mauldin, T. 4343–44).

30. The retail stores in Pulaski County are in three different districts. There is no correlation whatsoever between the district lines and the scope of the class involved in this lawsuit. (Mauldin, T. 4344).

31. Safeway has operated approximately 22 retail grocery stores in Pulaski County, Arkansas since January 30, 1977. These Pulaski County stores constitute portions of a number of different districts. The stores are identified by the following numbers:

| STORE NO. | ADDRESS |
| --- | --- |
| 129 | 1724 Main Street |
| 131 | 2100 Pike |
| 144 | 614 North Beechwood |
| 152 | 5501 Kavanaugh |
| 153 | 2400 South High |
| 167 | 4110 West 12th |
| 168 | 7507 Cantrell |
| 172 | 8001 Geyer Springs |
| 174 | 3000 South University |
| 175 | 901 West Third |
| 178/4011 | 4100 Asher |
| 179 | 1919 West 12th |
| 182 | 165 North Rodney Parham |
| 198 | 4701 JFK Boulevard |
| 199/266 | 4109 East Broadway |
| 212 | 7511 Baseline |
| 217/4006 | 3930 McCain |
| 220 | 10901 Rodney Parham |
| 243 | 6800 Asher |
| 258 | 8900 Geyer Springs |
| 180/2038 | Jacksonville |
| 274 | Sherwood |

(Jt. Exh. 1, Stip. 11).

### Class Issues

32. I find that the most pertinent credible and definitive testimony as to the class issues came from Safeway's expert, Dr. Finis Welch. Plaintiff-Intervenors' counsel engaged a total of three expert witnesses, none of whom personally testified in this case. Dr. Alda Moore's testimony was never presented. Dr. Richard Goldstein, plaintiff-intervenors' expert, was deposed by Safeway. Neither he nor his deposition was offered by plaintiff but was introduced by Safeway. Mr. Martin Mador testified by deposition as plaintiff-intervenors' only expert witness.

33. Mr. Mador has a B.A. degree in psychology from Yale (Plf.Exh. 20A, p. 12).

He is currently employed as a computer analyst by the NAACP Legal Defense Fund (Plf.Exh. 20A, pp. 8–12).

34. Mr. Mador stated that he would not be testifying as an expert statistician; his role was, according to him, limited to that of a computer analyst. (Plf.Exh. 20A, p. 7). Moreover, in numerous instances in his deposition, Mr. Mador stated that he would not be offering to the Court his opinion as to the meaning or significance of the material which he developed. (Plf.Exh. 20A, p. 8, 17, 49, 50–51, 83). Explicitly, he stated that he would not be asked at trial to draw any conclusions from the data. (Plf.Exh. 20A, p. 36).

35. Mr. Mador's deposition and work product was offered into evidence as Plaintiff's Exhibit 20. (Welch, T. 2122). His work product was composed of a series of computer printouts which were labeled for purposes of discussion in his deposition and in court as Exhibits 3A through 3J. Mr. Mador stated that he would offer no conclusions as to the bottom line meaning of any of these exhibits. (Plf.Exh. 20A, p. 17, 36, 49–51, 83). Additionally, the exhibits contained numerous errors and over-inclusions, according to the uncontroverted testimony of Dr. Welch. (Welch, T. 2225–97).

36. During his deposition Mr. Mador admitted that his Exhibit 3A was in error and that he could not rely upon it. (Def.Exh. 55, p. 61, 63). Mr. Mador agreed to correct the errors and resubmit it. However, this was never done. (Welch, T. 2249).

37. Many of Mr. Mador's exhibits depend on the ranking scheme which he developed. The ranking scheme he used was introduced as Defendant's Exhibit 16. (Welch, T. 2228). Based on the salary of a particular job contained in the EPIC database, Mr. Mador ranked the jobs, with the highest paid job receiving a rank of 1. (Welch, T. 2229).

38. In doing so, Mr. Mador developed ranks for 63 job categories. An inspection by Dr. Welch revealed that 32 of the job categories in the 63 categories were for jobs which were not included in the Stipulated Order. (Welch, T. 2235). Additionally, Dr. Welch noted that the ranks were not equidistant in the sense that the difference between ranks were not constant. (Welch, T. 2235). Dr. Welch extensively examined the first 25 job categories included in Mr. Mador's ranks. He found that of the first 25 job categories, there were 14 which were irrelevant in that they represented job categories which were not a part of the Stipulated Order. (Welch, T. 2239). He further noted that the job category "Head Produce Clerk" and "Produce Manager" were the same job but that the former had a rank of 3 and the latter a rank of 12. (Welch, T. 2236). Indeed, Dr. Goldstein stated in his deposition that the rankings appeared strange to him. (Def.Exh. 55, p. 116–17).

39. Mr. Mador's exhibits are also flawed since they include all persons who were ever in a relevant Safeway Store. That is, all of his printouts include all information for all employees who ever worked in a Safeway Store in Pulaski County regardless of whether they were in Pulaski County during the relevant time period and includes all changes in employment without regard to where the employee happened to be at the time. (Welch, T. 2249).

40. Dr. Welch stated that the data presented in Mr. Mador's printouts were the type which is commonly developed as a beginning point in statistical analysis—it did not represent a finished product. (Welch, T. 2260). Dr. Goldstein had read a copy of the transcript of Dr. Welch's deposition and was familiar with Dr. Welch's criticisms of Mr. Mador's exhibits. (Def. Exh. 55, p. 123). Based on this reading and a review of Mr. Mador's printouts, Dr. Goldstein stated that he did not have any reason to dispute Dr. Welch's criticisms of Mr. Mador's exhibits. (Def.Exh. 55, p. 123).

41. Finally, Dr. Welch stated that the data as offered by Mr. Mador were not in a form that was amenable to statistical analysis. (Welch, T. 2260). Specifically, he observed that the printouts did not contain any dispersion statistics which would be required to perform statistical tests of the

data. (Welch, T. 2276). Concurring with Dr. Welch, Dr. Goldstein, when asked if there were any valid statistical analyses which could be derived from this data, responded, "No, I don't see how." (Def.Exh. 55, p. 124).

42. Dr. Goldstein was initially contacted for work on this case by Mr. Mador in late October or early November of 1982. (Def. Exh. 55, p. 11). His initial instructions were to review the report of Safeway's expert witness, Dr. Finis Welch, and to observe strict cost limits in doing so. (Def. Exh. 55, pp. 96–97). When contacting him for work on this case, Mr. Mador stated that there were problems with Plaintiff's case. (Def.Exh. 55, p. 108). Mador also stated that he would not testify since there were no clear answers contained in his (Mador's) material. (Def.Exh. 55, P. 109). Further, Mr. Mador indicated to Dr. Goldstein that there were errors contained in his (Mador's) materials. (Def.Exh. 55, p. 109).

43. Dr. Goldstein's original role in the case was to provide questions to serve as a basis for the cross-examination of Finis Welch. (Def.Exh. 55, pp. 97–98). He agreed to testify for Plaintiff and Intervenors in January of 1983 after the testimony of Dr. Welch had concluded. (Def.Exh. 55, pp. 105–106). Subsequent to this time and the taking of his deposition on August 9, 1983, Dr. Goldstein essentially performed no work on this case. (Def.Exh. 55, p. 106).

44. Dr. Goldstein's presumed role in testifying was to be extremely limited. He planned to introduce no exhibits. (Def. Exh. 55, p. 10). He was unaware of the relevant time period for the case (Def.Exh. 55, pp. 128–29), and he never received a copy of the Stipulated Order. (Def.Exh. 55, p. 125). He stated that he was not familiar with the union contract. (Def.Exh. 55, p. 137). Moreover, he never reviewed the data base used by Dr. Welch. (Def. Exh. 55, pp. 93–94), and, because of this, stated that he planned no recalculations (Def.Exh. 55, p. 113). He had reviewed Dr. Welch's Volume II (Def.Exh. 1C) where the methods for creating the database were

described. Based on his review, he stated in his deposition that he had no objections to the manner in which Dr. Welch created the data base used in his analysis of the statistical issues in this case. (Def.Exh. 55, p. 129). Goldstein explicitly stated that he would offer no evidence of whether discrimination exists. (Def.Exh. 55, p. 126).

45. As he understood it, his role in testifying was to describe potentially biasing factors in Dr. Welch's study and factors which might limit its ability to show that the data are consistent with no discrimination. (Def.Exh. 55, p. 93). He was asked by Plaintiff and Intervenors' counsel to testify that his problems or reservations dealing with Dr. Welch's analysis implied that the data showed discrimination. He stated that he was unable to do this. (Def. Exh. 55, pp. 112–13). He was also asked by Plaintiff and Intervenors' counsel to provide testimony on the question of nepotism and stores in ghetto neighborhoods. Goldstein stated that he could do nothing statistical with either of these issues since he had no access to primary data. (Def. Exh. 55, pp. 110, 112–13).

46. In short, Dr. Goldstein's analysis of the statistical issues in this case was sharply limited. As he stated it, he could not disagree with Dr. Welch's conclusions without data. (Def.Exh. 55, p. 133). Goldstein stated that the reason he did not analyze the data base in the time period of his employment from November, 1982 to his deposition on August 9, 1983 was that Mr. Walker was unwilling to authorize him to do the analysis. (Def.Exh. 55, p. 165). He further stated that the constraints imposed on him by counsel for Plaintiff and Intervenors made him uncomfortable in providing expert testimony in the case. (Def.Exh. 55, p. 166). Dr. Goldstein did review Dr. Welch's report and, as his deposition reflects, had no serious disagreements with the report. (Def.Exh. 55).

47. Dr. Goldstein did not testify at trial, though his deposition was introduced by Safeway as part of its case-in-chief. (Def. Exh. 55, T. 4742–4746).

48. Dr. Finis Welch served as the statistical expert for Safeway. He brought an impressive array of credentials to this task as can readily be seen from a review of his resume. (Def.Exh. 1A, pp. 114–24). He is currently Professor of Economics at the University of California at Los Angeles. Additionally, he serves as President of Welch Associates and of UNICORN Research Corporation, both of which do contract research. (Welch, T. 2127).

49. Dr. Welch has an undergraduate degree in mathematics and agricultural economics from the University of Houston. In 1966, he received his Ph.D. in Economics from the University of Chicago. (Def.Exh. 1A, p. 114). He testified that, while in attendance at the University of Chicago, approximately one half of all of his courses were in statistics, mathematics, or econometrics. Also, he had a qualifying field in econometrics at the University of Chicago. (Welch, T. 2132).

50. Subsequent to his graduation, he pursued a number of learned activities. Initially, he served as a professor of economics at Southern Methodist University. In 1969 he was appointed a faculty fellow at the National Bureau of Economic Research. From 1971–1973 he served as Professor and Executive Officer of the Ph.D. program in economics at the City University of New York. From 1973 to the present, he has served as Professor of Economics at the University of California at Los Angeles. (Def.Exh. 1A, pp. 114–15). During the Spring of 1974, he founded and directed a program in labor and population studies for the Rand Corporation. (Welch, T. 2130). Finally, he has conducted a graduate seminar on labor economics and labor-related research for the past ten years. (Welch, T. 2129).

51. Dr. Welch either has been or currently is a member of several editorial boards responsible for the publication of scholarly journals in the field of economics. Among the editorial boards on which Dr. Welch currently serves are the *Economics of Education Review, Journal of Econom-ic Literature*, and the *Journal of Labor Research*. (Def.Exh. 1A, p. 116).

52. Among Dr. Welch's other professional activities are a number of distinguished committees on which he has served. In addition, he has served as a consultant to a wide range of organizations, including the Department of Labor. (Def.Exh. 1A, pp. 116–17). Dr. Welch stated that he was a member of a number of professional organizations; these included the American Economic Association and the Econometric Society. (Welch, T. 2129). Among his honors is that of currently serving as a Fellow of the Econometric Society. (Def.Exh. 1A, p. 117).

53. His publications are numerous and generally relate to topics in the field of labor economics. Finally, he has previously offered expert testimony in cases such as that before the Court. (Def.Exh. 1A, pp. 118–24).

54. Dr. Welch was offered for certification as an expert witness in statistics, labor economics, and computer programming and operations. Plaintiff and Intervenors' counsel, John Walker, stated, "... I think his qualifications are sufficiently impressive for him to be certified." (Welch, T. 2139). The Court agreed and accepted Dr. Welch as an expert in the fields of statistics, labor economics, and computer programming and operations.

55. Safeway introduced as Exhibits 1–A, 1–B, 1–C and 2–A, 2–B and 2–C several volumes of information produced by Dr. Welch. Defendant's Exhibit 1–A is titled by Dr. Welch "Volume I Statistical Analysis of Employment Practices: February 1, 1977 to December 31, 1981." Dr. Welch's Volume 1–A is titled "Volume 1–A Statistical Analysis of Employment Practices: Supplement for period February 1, 1977 to January 29, 1980" and was submitted as Defendant's Exhibit 1–B. Defendant's Exhibit 1–C was titled by Dr. Welch "Volume II: Data and Data Processing." Dr. Welch's Volume III appeared as three separate bound copies and has been introduced as Defendant's Exhibit 2–A, B, and C. These Exhibits contain a copy of the em-

ployment data used by Dr. Welch as the main source of data in his analysis. (Welch, T. 2126–2127).

56. Dr. Welch's main analysis of the statistical issues posed in this case is contained in Defendant's Exhibit 1A. The analysis in this exhibit covers the complete time period from February 1, 1977 through December 31, 1981 for which data was available. Dr. Welch also completed an analysis of the statistical issues for a shortened time period; this time period was from February 1, 1977 through January 29, 1980. He stated that he followed this procedure in order to assure himself that the patterns he determined for the longer time period also held prior to the filing of the case. That is, he attempted to determine whether there had been any significant changes in the employment patterns between the two segments of the liability period. (Welch, T. 2127).

57. The results of Dr. Welch's statistical analysis are presented, along with detailed written explanations of the analysis, including Tables and Figures, in Defendant's Exhibits 1A and 1B.

58. Dr. Welch's report is voluminous. I have carefully examined it and have heard his testimony in explication. I find that Dr. Welch has properly analyzed the Safeway employment data and that his conclusions are correct. (DX 1A, 1B, 1C, 2A, 2B, 2C). I find that his data base is proper and his methodology is correct. I observed Dr. Welch's demeanor on the witness stand for several days of direct and cross examination. In short, he convinced the Court beyond any reasonable doubt that he was an eminently qualified Labor Economist who had taken all appropriate precautions to see that the data was accurately presented and analyzed. The Court has also read the depositions of the Plaintiff and Intervenors' experts and finds that they did absolutely nothing to discredit Dr. Welch's methodology or his conclusions. As a matter of fact, Dr. Goldstein supports Dr. Welch. Even if Dr. Goldstein had not supported Dr. Welch, the Court would have credited his testimony. The only statistical

exhibits produced by Plaintiff and Intervenors were those of Mr. Mador. Dr. Welch discredited these exhibits and Dr. Goldstein seems to agree. The Court having listened to Dr. Welch's critique and having personally examined the multitude of errors concludes that they contribute nothing to Plaintiff's case. Given the fact that Plaintiff and Intervenors were given to November 22, 1981 to find Mr. Mador after the trial had begun in March and then were allowed over Safeway's strong objections to call a rebuttal expert (Dr. Goldstein) who had from November, 1982 to August, 1983 to carefully analyze Dr. Welch's findings, conclusions and methodologies, the decision to credit Dr. Welch's testimony is the only one to make which would not be clearly erroneous.

59. Dr. Welch provided an extensive analysis of promotion activity of Safeway from February 1, 1977 to December 31, 1981. This analysis is pertinent to the charges specified in section (a) and to one of the charges in section (d) of the Stipulated Order. (Def.Exh. 1A, p. 31). Dr. Welch divided his promotion analysis into two components. The first analyzed promotional activities of Safeway between specific job groups, while the second component investigated the statistical evidence for the aggregate of all promotions. (Def.Exh. 1A, p. 31).

60. Based on the total evidence offered by Dr. Welch relating to his analysis of the promotion practices of Safeway in the time period between February 1, 1977 to December 31, 1981, I find that there is no statistically significant evidence that Safeway's promotion practices have a differential effect on blacks. There is no statistically significant evidence that blacks are either more or less likely to be promoted than whites. (Welch, T. 2182).

61. The parties stipulated to the following class issue regarding movement from part-time to full-time status: "Black employees being denied full-time employment status because of their race, specifically involving (1) white part-time employees being given full-time status before black part-

time employees with greater seniority." (Stipulated Order).

62. In Chapter 5 of Defendant's Exhibit 1A, Dr. Welch initially addresses the question of whether there is a differential impact on blacks in movement from part-time status. The methodology used is similar to that used in his analysis of promotions. That is, pools of employees eligible for transition from part-time to full-time status were formed for each calendar date such a transition took place. Next, the race distribution of the persons moving from part-time to full-time status was compared to the race distribution of the pools from which they were drawn. (Def.Exh. 1A, p. 41).

63. The evidence offered by Dr. Welch, proves that there is no merit in the allegation that blacks are differentially treated in their reclassification from part-time to full-time status. The Court accepts Dr. Welch's findings and it finds no merit to the claim that blacks are less likely than whites to be reclassified from part-time to full-time status.

64. The parties stipulated to the following class issue regarding full-time new hires: Black employees being denied full-time employment status because of their race, specifically involving, ... (2) white employees being given full-time status when initially hired while black part-time employees were denied full-time status. (Stipulated Order).

65. Safeway did not offer any statistical analysis of its practice of hiring employees into full-time positions. Dr. Welch stated that the reason for not offering any such evidence was that the EPIC data base does not contain information on pre-Safeway work histories. In Dr. Welch's opinion, this information would have been essential to the evaluation of the initial assignments. (Def.Exh. 1A, p. 5). This is precisely the information provided in Defendants Exhibits 41 and 54. Further, Dr. Welch cited the fact that of more than 700 new hires during a liability period, only 16 persons were hired initially as full-time employees. (Def. Exh. 1A, p. 6).

66. The parties stipulated to the following class issue regarding reclassifications from full-time to part-time status: "Black employees being denied full-time employment status because of their race, specifically involving, ... (3) black employees being reduced from full-time to part-time status before white full-time employees with less seniority." (Stipulated Order).

67. On March 1, 1981, due to poor economic conditions, Safeway laid off a number of part-time employees and reclassified a number of full-time employees to part-time status. Both Intervenor Nowden and class member witness Norris were among those reclassified to part-time status. Intervenor Nowden claims that the reclassification was discriminatory while class member witness Norris concedes that the reclassification was due to economic conditions. In any event, when Nowden and Norris were reclassified to part-time status, there were no other food clerks with less full-time seniority, either black or white, who remained in full-time status. (Def.Exh. 40; Mauldin, T. 4410–12).

68. Dr. Welch noted that there have been only 22 movements from full-time to part-time status and that one employee accounted for two of these changes. (Def. Exh. 1A, p. 51). Dr. Welch did not perform a test of the statistical significance of these transitions since he considered the change too infrequent. Rather, he concentrated on full-time seniority and identified cases where he knew that the person moving to part-time status had less seniority than other employees, and cases where it could not be determined whether the person had more or less seniority than the person being reduced to part-time status. (Def.Exh. 1A, pp. 51–52). The ambiguity was caused by the fact that the EPIC data base was introduced in 1976 and pre-1976 work history which would show the length of service in part-time and full-time status was not entered into the data base. (Def.Exh. 1A, p. 53).

69. On the particular day a reduction in status to part-time took place, Dr. Welch placed the candidates in the pool of employ-

ees according to their full-time seniority. He then calculated two numbers for each person in the pool; their known tenure in full-time status and their known tenure in full-time status plus the period of indeterminate tenure. (Def.Exh. 1A, p. 54). As described by Dr. Welch,

> The first is the least amount of time someone could have been full-time while the second is an upper limit for full-time seniority. If the upper limit for the person actually reduced to part-time status falls short of the lower limit for everyone else in the pool, we know for sure that the affected employee had the least full-time seniority. Similarly, if the minimum for the affected party exceeds the maximum for anyone else, we know that the affected party did not have the least full-time seniority.

(Def.Exh. 1A, p. 54).

70. Of the 22 status changes, 11 were such that Dr. Welch determined that the person receiving a reduction to part-time status was the person with the least full-time seniority. In two of the cases, Dr. Welch determined that the person who was reduced to part-time status did not have the least full-time seniority. The remaining nine cases were considered ambiguous; however, Dr. Welch considered three cases to be so extreme that he thought it likely that the person with the least full-time seniority was the one demoted. (Def.Exh. 1A, pp. 54–55). Because of the infrequency of movement from full-time to part-time status, an alternative assumption designed to reduce the number of indeterminate cases was introduced by Dr. Welch. The alternative assumption was to formulate a rule that if someone was a part-time employee at the beginning of the EPIC tracing to consider the entire indeterminate period as being spent in part-time status. (Def.Exh. 1A, p. 56). Given this assumption, there remained only three indeterminate cases. In 15 of the remaining cases, the employee reduced to part-time status had the least full-time seniority. In four of the cases, the employee reduced to part-time status did not have the least full-time seniority. (Def.Exh. 1A, p. 57; Table 5.5,

Appendix I). Of these four employees, one was black and three were white.

71. Dr. Welch made two general observations concerning this data. First, as a general rule the person being reduced to part-time status did have the least full-time seniority. Second, there were obvious but infrequent exceptions (1 black, 3 whites) to this rule; however, the exceptions were so infrequent as to make it impossible to conduct any statistically valid test for the differential impact on blacks. (Def.Exh. 1A, p. 57).

72. The parties stipulated to the following class issue regarding the assignment of part-time hours: "Black part-time employees being assigned fewer hours to work per week than white part-time employees with less seniority." (Stipulated Order).

73. Dr. Welch failed to find any statistical evidence of discrimination in the average number of part-time hours assigned to blacks based on a test of the means, the Chi-square test of the full distribution of part-time hours, or on the regression models run on either the complete time period or on the individual years for which data were available. Whatever statistical evidence is available suggests that blacks work more part-time hours than whites; however, this evidence is not statistically significant. (Def.Exh. 1A, p. 59). Based on this careful and complete statistical analysis, there is no significant evidence of a differential between the average number of hours worked by part-time employees who are black or who are white.

74. The parties stipulated to the following class issue regarding relatives: "Black employees being denied promotions, reclassifications to full-time status and more hours of work because of their race in that such promotions, reclassifications and hours of work are given to white persons who have less seniority and are relatives of white officials, managers and other white employees of Safeway." (Stipulated Order).

75. The Plaintiff and Intervenors' evidence on the issue consisted of general

allegations of preferential treatment, generally lacking any proof of qualifications or seniority standing of either the black employee or the white relative that allegedly received preferential treatment. In addition to these general allegations, Plaintiff and Intervenors introduced a list of white relatives who work for Safeway in Pulaski County. (Plf.Exh. 48).

76. Employment Relations Manager Mauldin explained that there was no prohibition against hiring relatives of current employees. Mauldin explained that relatives of current employees are an excellent source of new employees for Safeway. (Mauldin, T. 4430).

77. Employment Relations Manager Mauldin responded to the general allegations of favoritism toward white employees by responding that relatives of white employees and relatives of black employees were treated no differently. Mauldin cited examples of black employees being given preferential treatment because of their relatives who were working for safeway. One such employee was class member Gloria King who was reclassified from part-time to full-time and transferred to Little Rock when her husband, then Store Manager, Marion King, was transferred from Pine Bluff to Little Rock. (Mauldin, T. 4430–33).

78. Safeway also presented an exhibit listing black employees who had relatives working at Safeway in Pulaski County. (Def.Exh. 48). Plaintiff McDowell had several relatives working for Safeway and other Intervenors and witnesses had numerous relatives working for Safeway in various positions.

79. While neither the Plaintiff and Intervenors nor Safeway presented any statistical analysis limited solely to relatives, the statistical analysis presented by Defendant Safeway and prepared by Dr. Welch showed that there was no significantly statistical difference between the treatment of blacks and whites in the areas of promotion, reclassifications from part-time to full-time status, and assignment of hours to part-time employees. (Def.Exh.

1A, 1B). Further, even class witness Miles Henderson stated that there was no discrimination in hiring. (Henderson, T. 1025).

80. The parties stipulated to the following issue regarding discharges: "Black employees being discharged because of their race." (Stipulated Order).

81. Given the definition of the termination reasons which implied discharge, Dr. Welch proceeded to analyze the statistical evidence of discharge activity by dividing his analysis into two components: post-probationary discharges and probationary discharges. (Def.Exh. 1A, p. 70). Plaintiff and Intervenors' expert, Dr. Goldstein, stated that he had no reservations with the separation of the analysis into the two components used by Dr. Welch. (Def.Exh. 55, pp. 140–41).

82. With regard to post-probationary discharges, Dr. Welch concluded that the statistical evidence did not offer proof of a statistically significant differential treatment of blacks who are discharged in the post-probationary period.

83. With regard to probationary discharges and in support of their claim that blacks are disproportionately discharged, the Plaintiff and Intervenors presented anecdotal evidence through Intervenor Carmen Smith and class member witnesses Betty Amos, Viveca Wilson, Olivia White, Pervis Lloyd, and Shirley Starks, all of whom claimed that they were discharged during their 30-day probationary period because of their race.

84. Plaintiff and Intervenors presented no statistical analysis concerning Safeway's probationary discharge practices.

85. Safeway responded to these allegations by presenting admissible testimonial and documentary evidence, not only concerning the discharges of the class member witnesses who testified, but also for all of the sixty probationary discharges in Pulaski County from January, 1977 through 1981. (Goens, T. 4025–28, 4030–34; L. Hill, T. 3472–79; S. Hill, T. 4246–62; Marcussen, T. 4308–10; Marks, T. 4690–92; Clark, T.

4699–4701; Maurice, T. 4710–13; B. Smith, T. 4719–21; Harms, T. 4733–34; Def.Exh. 46, 47, 52).

86. In addition to the evidence concerning the reasons for each of the sixty probationary discharges, Defendant Safeway provided a statistical analysis of its probationary discharges.

87. A summary of Dr. Welch's analysis of probationary discharges is contained in Table 7.1 of his report. (Def.Exh. 1A, p. 73; Table 7.1, Appendix I). In this table the total number of new hires in the Courtesy Clerk, Apprentice Clerk and Journey Clerk categories is reported together with the number of persons who were discharged from these categories during their first 30 days of employment. Dr. Welch also displayed in this table the actual and expected number of blacks discharged during the probationary period. Based on this data he computed a measure of the statistical significance of the difference between the actual and expected number of blacks. This calculation was performed by calculating the expected proportion of black representation among discharges and the actual proportion of black representation among discharges. The statistical significance of the difference between the two proportions was then calculated by using the normal approximation to the binomial distribution. (Def.Exh. 1A, pp. 71–72, 84).

88. The outcome of Dr. Welch's statistical test is listed under the column labeled "Number of Standard Deviation Units" in his Table 1. Since the number of reported standard deviations is, except for one "small number case" in the Journey Clerk category, greater than two, Dr. Welch concluded that the data supported the inference that newly hired blacks were statistically more likely than whites to be discharged during probation. (Def.Exh. 1A, p. 72).

89. However, Dr. Welch also noted that 20.6% of the new hires during the 02/01/77 to 12/31/81 period were black. Of the persons hired during this time period, 83.8% eventually passed probation, and, of these persons, blacks represented 18.14%

of the total. (Def.Exh. 1A, pp. 72–74). The relevant labor market for total black representation in Little Rock/North Little Rock Standard Metropolitan Statistical Area (SMSA) is 18.0%. (Def.Exh. 1A, p. 72). Dr. Welch used these observations to conclude that the data were about what one would expect from an affirmative action policy to recruit blacks. Based on these data, the fact that after the probationary period 18.14% of Safeway's work force is black and that this corresponded to black representation in the relevant labor market, Dr. Welch observed that the fact that blacks are not underrepresented among persons surviving probation is consistent with employment patterns he has studied where the employer has an affirmative hiring policy. (Def.Exh. 1A, p. 8).

90. While a statistically significant disparity between black and white discharge rates during probation was revealed by the analysis of the data, a full consideration of the data suggests that they are not unlike those which would be expected from an effective affirmative action policy. Standing alone this evidence would be entitled to little weight, but it serves to buttress the other evidence including the chart explaining the whole range of employment decisions analyzed and the individual reasons for each discharge.

91. Moreover, Dr. Welch stated that it is statistically unsurprising to find one employment practice which shows a differential in favor of whites given the large number of employment practices analyzed in this case. (Welch, T. 2296–99).

92. Dr. Welch calculated the exact probability of finding one statistically significant result favoring whites (probationary discharges) out of the 17 employment practices which he investigated. The chance or probability that when 17 comparisons between blacks and whites are made that one would find one practice favoring whites in a race-blind or neutral environment was computed by Dr. Welch to be 58 percent. (Welch, T. 2298). Thus, finding one statistically significant result favoring whites is unsurprising. (Welch, T. 2299). After re-

viewing this table, Dr. Goldstein agreed with Dr. Welch that finding one of the tests showing whites were favored was a statistically unsurprising result. (Def.Exh. 55, p. 165).

93. Additionally, Dr. Welch cautioned that he knew of no accurate way of testing for class-wide disparate treatment in termination without detailed case-by-case records of individual decisions. These data were not available to him. (Def.Exh. 1A, p. 8).

94. Safeway heeded Dr. Welch's caution and provided a detailed case-by-case analysis of each and every probationary discharge. (Def.Exh. 46, 47, 51, 52). Not only do these Exhibits, buttressed by live testimony, reflect a legitimate non-discriminatory reason for each discharge, but also one observes the same and/or similar reasons listed for discharged probationary employees who were black and white.

95. The parties stipulated to the following class issue regarding the Store Management Training Program: "Black employees being subjected to discriminatory treatment with regard to the Safeway Store Management Training Program, specifically involving: (1) being denied entry into the program on the basis of race; (2) after entry into the program, being denied proper training and being subjected to adverse treatment on the basis of race; and (3) after entry into the program, being demoted or discharged from the program on the basis of race." (Stipulated Order).

96. In addition to this anecdotal, rebuttal evidence, Safeway produced a statistical analysis of its practices concerning the entry into and the completion of the Store Management Training Program by its employees.

97. Dr. Welch's analysis of Safeway's Store Management Program is contained in Chapter 8 of Defendant's Exhibit 1A. He divided his analysis into 3 components: analysis of entry into the program, analysis of successful completion of the program, and analysis of promotion to the managerial level. (Def.Exh. 1A, p. 79). Dr. Welch's analysis of these issues paralleled the charges in Section (f) of the Stipulated Order. (Def.Exh. 1A, p. 79).

98. After analyzing the likelihood of entry into the SMTP, of completion of the program, and of promotion to a management position, Dr. Welch found no statistical evidence of an adverse differential effect on blacks. (Def.Exh. 1A, p. 84). However, the almost 2 to 1 overrepresentation of blacks among persons entering the program suggested to him an effort to increase the representation of blacks in management. The higher entry rate for blacks, coupled with the somewhat lower completion success of blacks and the higher likelihood that blacks who successfully complete the program would attain a management position, were very similar to Dr. Welch's findings for probationary discharges. Both of these findings are consistent with an attempt to increase black representation at all levels of the work force. (Def. Exh. 1A, p. 84).

99. The parties stipulated to the following class issue concerning shift assignments: "Blacks subjected to discriminatory working conditions which can be remedied only through injunctive and declaratory relief including, (1) being assigned the least desirable shifts." (Stipulated Order).

100. Plaintiff and Intervenors presented no statistical analysis concerning Safeway's assigning of shifts to employees.

101. Defendant Safeway did present a statistical analysis concerning Safeway's practice of scheduling shifts.

102. Based on the total analysis of premium, overtime, and Sunday and holiday hours, Dr. Welch concluded that the assignment of these hours to blacks and whites occurs in a race-neutral fashion and that there is no statistical evidence that blacks receive more or less hours of any type than whites. Consequently, it is illogical to conclude that blacks are assigned to the least desirable shift, presuming any constant definition of "least desirable".

103. The Court credits Dr. Welch's analysis and was impressed with its thoroughness. Plaintiff and intervenors failed to

controvert any portion of Dr. Welch's findings regarding this issue and the Court accepts Dr. Welch's conclusions after hearing the testimony and evaluating. all the evidence.

104. The parties stipulated to the following class issue concerning work assignments: "Blacks subjected to discriminatory working conditions which can be remedied only through injunctive and declaratory relief including, . . . (3) being given more onerous and difficult work assignments than white employees." (Stipulated Order).

105. In support of their allegation that blacks as a class are assigned to more onerous working conditions, Plaintiff and Intervenors were unable to produce any evidence other than anecdotal testimony that a. few witnesses had to do cleanup work and other work which they considered to be menial. Defendant Safeway provided evidence that all employees, white and black, in the store, up to and including managers, do cleanup work and other menial tasks. (e.g., Mahaffey, T. 3189; Martin, T. 3304; Hanle, T. 3964).

106. After hearing all the evidence, the Court finds that such work assignments were not made on the basis of race.

### Individual Claims of Plaintiffs and Intervenors

107. In addition to the statistical testimony developed in this case, there was a mass of other testimony concerning the class allegations. In consideration of these allegations, it is proper to examine the Safeway affirmative action plan. Safeway is required by Executive Order 11246 to have an Affirmative Action Plan. The language and format of Safeway's Affirmative Action Plan were developed on a national level at Safeway headquarters in Oakland. This national plan was adopted and implemented on a divisional level throughout the country. Only the goals and timetables of the Affirmative Action Plan are unique to the Little Rock Division. (Mauldin, T. 4356–57).

108. The Division Manager in the Little Rock Division is ultimately responsible for the implementation of the Affirmative Action Plan. The Division Manager delegates the functional responsibility of implementing the Affirmative Action Plan to the Employment Relations Manager. The Division Manager and the Employment Relations Manager are the two persons in the Little Rock Division who are actually responsible for the implementation of the Affirmative Action Plan. (Mauldin, T. 4357).

109. Goals and timetables within the Little Rock Division are set on a district-by-district basis within the Division. This is the way in which goals and timetables are set within divisions in Safeway all.over the country. (Mauldin, T. 4357).

110. In setting goals and timetables for bargaining unit positions, Safeway utilizes the general population percentage of minorities in the various Standard Metropolitan Statistical Areas (SMSA's) in which the stores in the district are located. The Office of Federal Contract Compliance Programs (OFCCP), the governmental body charged with responsibility for overseeing Executive Order 11246, accepts Safeway's method of setting goals and determining underutilization by comparison to general population statistics. However, the OFCCP would rather Safeway use the full eight factor availability analysis to determine underutilization. The effect of adopting the eight factor analysis would be to decrease the goals that Safeway sets in its affirmative action plan. Safeway has consistently rejected the efforts of the OFCCP in this regard. (Mauldin, T. 4357–58).

111. Within the Little Rock Division, goals and timetables are separately set for each of the five districts comprising the Little Rock Division. As discussed earlier, the geographic areas of these districts do not in any manner correspond to the geographic area covered by the scope of this lawsuit since this lawsuit involves stores in Little Rock, North Little Rock and Jacksonville which are in parts of three different districts within the Little Rock Division. (Mauldin, T. 4344, 4357).

112. Within the Little Rock. Division, the persons who make the personnel decisions are the District Managers, the Employee Relations Supervisor, and the Employment Relations Manager. The District Managers make decisions, with input from the Employment Relations Manager, on promotions and discharges of bargaining unit personnel. The Employee Relations Supervisor is responsible for the hiring and initial placement of bargaining unit personnel and reports directly to the Employment Relations Manager. The Employment Relations Manager is responsible for making personnel decisions concerning the administration of the Union contracts in areas such as reclassifications from part-time to full-time, promotions, discharges, etc. (Mauldin, T. 4364).

113. The Affirmative Action Representative reports directly to the Employment Relations Manager. This is not a decision-making position. The Affirmative Action Representative is responsible for reporting and record keeping requirements under Executive Order 11246, and for providing the persons who make personnel decisions with reports on information concerning affirmative action efforts. (Mauldin, T. 4364-65).

114. The Affirmative Action Representative prepares a quarterly affirmative action report which is submitted to Safeway's headquarters in Oakland which monitors the Little Rock Division's progress. The Affirmative Action Representative also prepares quarterly reports for the five District Managers within the Little Rock Division, itemizing underutilization by job groupings in each store. In addition to the District Managers, this report is given to the Division Manager, the Employment Relations Manager, and the Retail Operations Manager. Further, the Affirmative Action Representative prepares a monthly report on underutilization which shows total underutilization by each store. This report is also distributed to the Division Manager, the Retail Operations Manager, the Employment Relations Manager, the Employee Relations Supervisor, and the District Managers. In addition, the Affirmative Action Representative and the Employment Relations Manager monitor weekly and monthly computer reports on promotions and terminations and new hires. (Mauldin, T. 4356-66).

115. The Little Rock Division also has quarterly district managers meetings which are attended by the District Managers, the Division Manager, the Retail Operations Manager, the Employment Relations Manager, and the Employee Relations Supervisor. The sole topic of these meetings is affirmative action and Safeway's efforts to meet its affirmative action goals. In addition, there are semi-annual store managers meetings where affirmative action efforts are discussed. Finally, there are frequent information meetings between Employment Relations Managers and all decision makers concerning affirmative action within the Little Rock Division. (Mauldin, T. 4366).

116. The OFCCP has audited Safeway's Affirmative Action Plan from time to time. The Little Rock Division has never been charged or found by the OFCCP to be deficient in fulfilling its affirmative action obligations under Executive Order 11246. The only area of contention between Safeway and the OFCCP has been that the OFCCP has asked Safeway to prepare a full eight factor analysis to determine availability while Safeway wants to use general population figures, which yields higher goals. (Mauldin, T. 4366-67).

117. With respect to promotions of blacks, Stephanie Adams and Intervenor Doby claimed that they were denied promotions because of race (Doby T. 763-66, 768-69, 787, 824-26; Adams, T. 331-32, 334-40, 348-50). Against their claims the record is replete with uncontradicted testimony that many blacks had been promoted by Safeway. As a matter of fact, Ms. Adams has been promoted since this litigation began. (Mauldin, T. 4374-76).

118. Under the collective bargaining agreement between Defendant Safeway and Defendant Retail Clerks Union, after giving due regard to seniority, Safeway may promote employees within its discre-

tion. All things being equal, Safeway promotes by seniority. The collective bargaining agreement provides a recourse to employees who believe they were passed over for promotion through the grievance procedure. It should be noted that a reclassification from part-time to full-time within the same job classification is not a promotion and not governed by this contractual provision, but by other provisions within the collective bargaining agreement. (Mauldin, T. 4369–70).

119. Employment Relations Manager Mauldin testified that Safeway is very mindful of its Affirmative Action Program in making promotional decisions. Mauldin testified that Safeway purposefully looks for qualified blacks and females. (Mauldin, T. 4370).

120. With regard to the allegations by Intervenor Nowden and class member Adams that they were denied promotions to front end manager, Employment Relations Manager Mauldin explained that the front end manager position was nothing more than one of a number of functions performed by an employee in the food clerk classification, just as stocking and checking are functions within the food clerk classification. Employees who act as front end managers are still classified and paid as food clerks. (Mauldin, T. 4348). Accordingly, a functional move from checker to front end manager is simply a move within the employee's current classification and not a promotion according to the Stipulated Order. Similarly, there is no classification of assistant deli manager, and the position sought by Doby was simply one of a number of functions performed by a deli clerk classification. (Mauldin, T. 4374).

121. Testimony adduced on behalf of the plaintiff and intervenors does not contradict the statistical conclusion that there is no discrimination in advancement of Safeway employees from part-time to full-time status.

122. In response to the general allegation that Safeway discriminates in reclassifying employees from part-time to full-time status, Employment Relations Manager Mauldin explained the ways in which an employee could achieve full-time status:

(A) By far the most common method of achieving full-time status is by being the most senior available part-time employee within a classification in Pulaski County when a full-time vacancy occurs in that classification. (Mauldin, T. 4382–83).

(B) Another way in which an employee can achieve full-time status is by working 40 hours for four consecutive weeks. Once this occurs, the employee is automatically reclassified from part-time to full-time status by operation of the collective bargaining agreement. This most often occurs with food clerks whose function is night stocking. These are the least desirable hours but it is a full-time position. Once they have worked at the position for four weeks, they are automatically reclassified to a full-time position. (Mauldin, T. 4381–83).

(C) An employee can achieve full-time status by being promoted into a classification that has no part-time positions, such as head clerk, department manager, or Store Management Training Program. (Mauldin, T. 4381–82).

(D) Finally, an employee can obtain full-time status by being hired into a full-time position. Although rare, this does occur. As noted earlier, some classifications have no part-time employees. In filling vacancies in these full-time classifications, Safeway can promote from within or hire from without. Normally Safeway choses to promote from within, but in some circumstances Safeway will hire from the outside. This most often occurs when Safeway needs to hire someone with a particular skill (such as a florist) or a night stocker (because other food clerks are not willing to work nights). (Mauldin, T. 4381–84).

123. An analysis of the evidence discloses that in these exceptions to the seniority rule, racial discrimination has not been involved. Both blacks and whites have taken advantage of these exceptions to move from part-time to full-time employment. All employees have recourse to the con-

tract grievance procedure if they feel they were wrongfully passed over for a reclassification from part-time to full-time status. (Mauldin, T. 4385–86).

124. Intervenor Nowden and class member witnesses Adams and Jefferson testified that while employees were hired into full-time positions at a time when Nowden, Adams and Jefferson were still part-time and seeking a full-time position (Nowden, T. 1125–27, 1230–56; Adams, T. 350–51, 374–76; Jefferson, T. 272, 287–95, 298–99). During the pertinent period out of 700 new hires only 16 persons were hired initially as full-time employees. (Def.Exh. 1A, p. 6). Two blacks who testified as class member witnesses, Ronald McCollum and Melvin Pride, were hired as full-time food clerks (McCollum, T. 1061; Pride, T. 1977).

125. In response to the general allegation that it discriminated against part-time employees by hiring full-time white employees, Employment Relations Manager Mauldin explained Safeway's practice with regard to the hiring of new employees in a full-time status. First of all, it is very rare for Safeway to hire an employee into a full-time position. However, if a full-time vacancy in a classification occurs, and no part-time employee is available, then Safeway can hire a full-time employee. This occurs most often in the hiring of food clerks who function as night stockers. Also, if a vacancy occurs in a position which has no part-time status, Safeway can either promote an employee into the full-time position or hire a new employee for the full time position. Generally, Safeway choses to promote from within and hire a new employee only if the new employee has some special skill needed by Safeway. (Mauldin, T. 4412–13).

126. I find an absence of credible proof that there was discrimination in the hiring of full-time employees.

127. I also find an absence of discrimination in reclassification of employees from full-time to part-time status. The Plaintiff and Intervenors' only anecdotal evidence concerning this issue consisted of testimony by Intervenor Nowden who claimed she was discriminatorily reclassified from full-time to part-time status on September 28, 1980 and again on March 1, 1981. (Nowden, T. 1144–49, 1151–65, 1240–51). Class member witness Ray Norris testified that he too was reclassified from full-time to part-time status on March 1, 1981, but Norris conceded that the reclassification was due to a reduction in force due to poor economic conditions, and that the reduction was not discriminatory. (Norris, T. 1095).

128. Employment Relations Manager Mauldin explained that a reclassification from full-time to part-time only occurs when either the employee voluntarily asks for such reclassification or there is a reduction in force. Reductions in force are made by reclassifying the least senior full-time employee. This is done by date of obtainment of full-time seniority, not by date of hire. (Mauldin, T. 4409–10).

129. When Intervenor Nowden was reclassified from full-time to part-time status on September 28, 1980, she was the least senior food clerk in her store, but not in Pulaski County. There were three less senior full-time food clerks who were performing the function of night stocker in other stores in Pulaski County. Two of these employees were white, and one was black. (Def.Exh. 40). Intervenor Nowden filed a grievance with the Union stating that she was improperly reclassified to part-time status under the provisions of the contract. Although the three less senior full-time food clerks were performing a different function than Nowden (night stocking vis-a-vis checking), the fact remains that they were food clerks with less full-time seniority than Intervenor Nowden. (Def.Exh. 40). After this was brought to Safeway's attention at a grievance meeting, Nowden was reclassified from part-time to full-time status. (Nowden, T. 1151–53, 1159–60; Mauldin, T. 4411). Nowden made no allegation that the grievance was handled improperly and it is obvious that, in this case, the grievance procedure worked to the employee's benefit.

130. The Court finds that there was no discrimination with respect to the assignment of hours of work for part-time employees.

131. The only specific evidence presented by Plaintiff and Intervenors on this issue was the identification of certain white employees with less seniority who, from time to time got more total hours at the end of the week than Intervenors Nowden and Doby. Neither Nowden nor Doby alleged that these white employees were actually scheduled to work more hours, but alleged that Safeway, through unscheduled call-in hours, gave these employees more hours even though they had less seniority than Nowden and Doby. (Nowden, T. 1267–74; Doby 785–87, 812–816).

132. Plaintiff and Intervenors also presented some evidence that a white employee, Gina Clark was scheduled for 26 hours of work regardless of her seniority standing within the store. (Marion King, T. 1405–07, 1462–63; Garrett, T. 1490–1501).

133. Employment Relations Manager Mauldin explained that part-time hours are scheduled within the store, by seniority and availability. The schedule is posted on Friday for the following week, and according to the union contract, the employees have 24 hours to protest the schedule. These scheduled hours are always posted on the basis of seniority and availability. (Mauldin, T. 4414; Def.Exh. 11, 12, 13).

134. Many part-time employees work non-scheduled hours in addition to the hours that they are scheduled. These hours are assigned in order of seniority and availability. If a more senior employee is not available at the time needed, then a less senior part-time employee who is scheduled for fewer hours may be called in to do the unscheduled work and consequently receive, for the full week, more hours than a more senior employee. When unscheduled hours become available, the Store Manager simply begins calling employees in order of seniority. If an employee does not answer the telephone, declines the hours, or is already scheduled to work, the employee is unavailable for work and the unscheduled work is offered to the next senior employee. (Mauldin, T. 4415–16).

135. In response to the identification of white employees with less seniority who got more hours than Intervenors Nowden or Doby, Safeway responded, through Employment Relations Manager Mauldin, that due to the problem with unscheduled hours and availability, it is quite possible that some less senior employees did indeed get more hours than Nowden or Doby. (Mauldin, T. 4416). However, Safeway produced uncontroverted evidence showing that Intervenor Nowden got more part-time hours than three senior food clerks while she was working at Store No. 168, and more part-time hours than four senior food clerks at Store No. 258. (Def.Exh. 42). Similarly, Safeway produced admissible evidence showing that Doby received more hours than four senior deli clerks at Store No. 258. (Def.Exh. 43).

136. With regard to the allegation that white employee Gina Clark was assigned to 26 hours, regardless of her seniority standing within the store, Employment Relations Manager Mauldin explained that Gina Clark had filed a sexual harassment claim against one of the managers in her store. The manager took and passed a lie detector test. Safeway, with the Union as a party, settled the charge of sexual harassment by transferring Clark to another store with a guarantee that she would be scheduled 26 hours of work, regardless of her seniority ranking in the new store. This was agreed to among Safeway, the Union, and Gina Clark. (Mauldin, T. 4417).

137. Safeway has no policy against hiring relatives and I find no evidence that there has been discrimination in this area. Both black and white relatives of Safeway employees have been hired.

138. With regard to the class allegations on discharging, the proof of Plaintiff and Intervenors focused on several individuals whose cases will be dealt with individually, *infra.* We have already discussed the statistical information on this issue.

139. The parties stipulated to the following class issue regarding the Store Management Training Program: "Black employees being subjected to discriminatory treatment with regard to the Safeway Store Management Training Program, specifically involving: (1) being denied entry into the program on the basis of race; (2) after entry into the program, being denied proper training and being subjected to adverse treatment on the basis of race; and (3) after entry into the program, being demoted or discharged from the program on the basis of race." (Stipulated Order).

140. Plaintiff and Intervenors' anecdotal evidence supporting their claim that blacks as a class are denied entry into the Store Management Training Program consisted of the testimony of Plaintiff Charlotte McDowell and class member witness Stephanie Adams and Don Jefferson, who all claim they were discriminatorily denied entry into the Store Management Training Program. However, neither Plaintiff McDowell nor class member witness Jefferson presented any evidence whatsoever concerning their qualifications to be put into the Store Management Training Program. Class member witness Adams did provide evidence of her qualifications to be placed into the Store Management Training Program. (McDowell, T. 1841; Adams, T. 340–41, 347–50, 369–72; Jefferson, T. 270).

141. Intervenor John Nimmer also made allegations on this issue. When hired by Safeway he was told by Dixie Employment Agency that Safeway was looking for blacks to go into their Store Management Training Program. Intervenor Nimmer further testified that he was placed into the Store Management Training Program shortly after asking white District Manager Clyde Godwin if he (Nimmer) could be placed into the program. (Nimmer, T. 844, 849, 947–51).

142. Class member witnesses Ronald McCollum and Billy Wilson, along with non-class member witnesses Sam Bryant, Marion King, Jessie Smith, James Smith, and Miles Henderson, all testified that they were steered into the Store Management Training Program by their white superiors. (McCollum, T. 1049–51; Wilson, T. 1062–63, 1072; Bryant, T. 1958–61; King, T. 1387–90; Jessie Smith, T. 2001–05; James Smith, T. 1573–75, 1605; Henderson, T. 1015–16).

143. Class member witness Adams, in testifying as a rebuttal witness, conceded that she had been placed into the Store Management Training Program and was currently undergoing training. (Adams, T. 4877–81).

144. In support of the allegation that blacks as a class are not given proper training while in the Store Management Program and consequently not able to complete the Store Management Training Program, the Plaintiff and Intervenors presented the anecdotal testimony of Intervenor John Nimmer and class member witness Ronald McCollum who alleged that they were not given proper training while in the Store Management Training Program and subsequently were demoted out of the program. (Nimmer, T. 848–903, 966–1004; McCollum, T. 1056–59).

145. Class member witness Billy Wilson testified that he successfully completed the Store Management Training Program under store manager Don Goens in one year with no problems. Non-class member witnesses Miles Henderson, Marion King, Sam Bryant, James Smith and Jessie Smith all conceded that they were trained in the Store Management Training Program and successfully completed their training program. In addition, evidence was introduced that class members Ferryl Barnes, Michael Metcalf and Lonnie Mays also successfully completed their training in the Store Management Training Program. (Wilson, T. 1064–65, 1073–74; Henderson, T. 1016; King, T. 1400–02; Bryant, T. 1928–33, 1973; Jessie Smith, T. 2001–05, 2038–39; James Smith, T. 1573–82, 1605; Nowden, T. 1142–43).

146. As to class member witness Adams' allegation that she was denied entry into the Store Management Training Program, Employment Relations Manager Mauldin did not understand Adams' request for a promotion to include a request

for placement in the Store Management Training Program. After hearing Adams' testimony, Mauldin started the mechanisms which subsequently led to her entry into the Store Management Training Program. (Mauldin, T. 4374–76).

147. With regard to Intervenor Nimmer's allegation that he was denied proper training while in the Store Management Training Program, Safeway produced Nimmer's personnel file (Def.Exh. 4) and the testimony of District Manager Clyde Godwin, former Store Manager Eloise Mahaffey, former Store Manager Gerald Martin, Store Manager Harold Trimble, former Store Manager Don Goens, and Store Manager Charles Fisher. The Court credits this testimony based upon having observed all the witnesses and evidence. The composite of this testimony was to the effect that Nimmer had the mental ability to succeed in the Store Management Training Program, but that he never applied himself to learning and properly performing the physical operations of a store section—the most important aspect of the Store Management Training Program. Despite numerous and extraordinary efforts on the part of Safeway to provide Nimmer with circumstances in which he could prove his ability, Nimmer continually fell below the expectations of a Store Management trainee and was finally removed from the program. (Godwin, T. 3663–78; Mahaffey, T. 3182–90; Martin, T. 3283–3304, 3401–03; Trimble, T. 3409–19; Goens, T. 552–70, 4044–45; Fisher, T. 1697–1713, 1725–31, 1756).

148. Nimmer attempted to prove the reasons for his removal from the Store Management Training Program to be pretextual by alleging and introducing evidence that his (Nimmer's) work while in the Store Management Training Program was equivalent to the work of other night stockers who were not in the Store Management Training Program. (Nimmer, T. 961, 964; Nowden, T. 207–11; Garrett, T. 1487–89, 1498).

149. Class member witness McCollum alleged that he was not properly trained in the Store Management Training Program. Even if it were true that McCollum did not receive the proper training, there is no evidence in the record to suggest that Safeway intentionally denied McCollum proper training because of his race. The evidence falls far short of proving that Safeway discriminates against blacks in training blacks in the SMTP.

150. The parties stipulated to the following class issue concerning racial harassment: "Blacks subjected to discriminatory working conditions which can be remedied only through injunctive and declaratory relief including, ... (2) being subjected to racial harassment, racial epithets, and racial jokes." (Stipulated Order).

151. In support of its allegation that blacks as a class are subjected to racial harassment, the Plaintiff and Intervenors presented evidence of sporadic and isolated incidents of the use of racial epithets and the telling of racial jokes.

152. Employment Relations Manager Mauldin testified that he was unaware of any racial harassment in Pulaski County. Mauldin stated that no employee had reported any racial harassment to him. Mauldin also stated that racial harassment was prohibited by Safeway and that Safeway would take appropriate action concerning any racial harassment. (Mauldin, T. 4435–36).

153. Most of Plaintiff and Intervenors' own witnesses either did not testify on this issue or said they knew of no such activity. The record is almost completely barren of racial terms when their use is limited to management officials. Based on the insignificant amount of such terms in this case it is readily apparent that Safeway has done a good job in providing a non-hostile and racially neutral work environment. Finally, the Union contract prohibits race discrimination and there was no evidence of any grievance being filed on this issue. After a careful review of the entire transcript of the trial testimony and during such review recalling the demeanor of the witnesses, the Court is left with the clear impression that no racial harassment of

employees by Safeway officials and managers took place nor did Safeway permit a racially hostile environment to exist.

### Individual Claims of Plaintiff and Intervenor

#### A. Charlotte McDowell

154. The parties stipulated that Plaintiff, Charlotte McDowell, a black female, was hired by Safeway on August 8, 1975 as a part-time Food Clerk in Store # 167 (4110 West 12th). She transferred to the following stores:

| Date | Store/Position |
| --- | --- |
| January 9, 1977 | Store 172, (8001 Geyer Springs) |
| August 14, 1977 | Store 179, (1919 West 12th) |
| March 19, 1978 | Store 212, (7511 Baseline) |

McDowell was discharged on or about September 12, 1979. (Jt.Exh. 1, Stip. 29).

155. McDowell alleged that she was discharged on September 9, 1979 for her involvement in an altercation with two customers and that this discharge was racially motivated because whites who have been involved in similar incidents have not been discharged.

156. Ms. McDowell's version of the incident is that she was attacked without provocation by two male customers after they had called her a "black bitch" and harassed and intimidated her. Only after they had physically assaulted her did she grab one by the hair and pull out some of his hair. After they left the store she pursued them in her automobile in order to obtain their automobile's license number since the store manager did not obtain their identities. In support of her version of the incident, McDowell presented her own testimony and that of a witness, Toyce May, who allegedly was a customer in the store at the time of the altercation. May admitted she did not know McDowell at the time she witnessed the incident and that her next contact with McDowell was two weeks prior to her testimony (well over three years after seeing McDowell for the first time in her life) when she recognized McDowell at church and asked if she was the lady involved in the Safeway incident. May admitted that she had been convicted of theft. (May, T. 456–63).

157. Safeway witnesses presented a different version of the incident. They claimed that McDowell was the aggressor; that she threw her shoe at the customers (Cullins, T. 3838) as they attempted to leave, according to a former Safeway employee, now a college student:

> I saw Charlotte run after him. She jumped on his back. She was like a crazy woman. She jumped on him like a horse almost. She—she embraced her legs around his abdomen and she just started kicking and scratching and he was trying to hold her off.
>
> The other gentleman started in from the "out" door and was trying to pull her off of him, and I ran out of the booth and I tried to pull her hand out of his hair, and she had started grabbing his hair and was just pulling it, and he was trying to shake her off of him.
>
> And she hit the bascarts from him trying to shake her off of him, and I could not release her hand from his hair. It was just impossible.
>
> And Mr. McDonald and Mr. Fisher ran out of the booth, and they tried to separate them, and they had a little more success than I did, but it—and Scott Simpson, which was a courtesy clerk at the time, he helped them. So it took all four of us just to get her off of him.

(Lavender, T. 3790–91). The above version is corroborated by Safeway employees Cullins (T. 3838–55); McDonald (T. 3747–51); Mahan (T. 3865–69) and Fisher (T. 1640–57), the store manager.

158. Although no one employee saw the entire incident, none saw either of the men hit McDowell and all testified that McDowell was the aggressor. During the fight, McDowell was heard to say "I can beat you two white guys up" and "a little woman can whup two men any day." (Cullins, T. 3838; Mahan, T. 3867; Simpson, T. 3897; Lavender, T. 3789; Fisher, T. 1650–54).

159. After Fisher and other store personnel succeeded in convincing McDowell to let go of the customer's hair, Fisher told

the customer to leave and check with him later and told McDowell to go into the store office. Instead of going to the store office, McDowell pursued the customers outside, got into her car and chased them east on Baseline Road. The Customers returned and informed Fisher that they thought McDowell had a gun. McDowell then re-entered the store behind them. (Fisher, T. 1655–65; McDonald, T. 3750).

160. Fisher told Assistant Manager McDonald to take the two customers to the back of the store and hide them, and the Sheriff, Safeway's Security Department, and the Union were called. (McDonald, T. 3750; Fisher, T. 1666, 1670–71).

161. The sheriff's deputies arrived and interviewed the customers and McDowell. (Lavender, T. 3793–94).

162. Clyde Godwin, the District Manager, Jerry Grissen, Head of Safeway Security, and Cecil Casey and Marvin Robertson, Union Representatives, arrived at the store and talked to McDowell, the customers and all witnesses. (Lavender, T. 3793–94).

163. Pursuant to Safeway's discharge procedures, McDowell's case was reviewed by Employment Relations Manager Gerald Mauldin, District Manager Clyde Godwin, Retail Operations Manager George Unti, Division Manager Donald Phillips and Store Manager, Charles Fisher. After reviewing all the facts available, it was unanimously decided that Charlotte McDowell should be discharged because of her incivility and aggressiveness in pursuing a fight with a Safeway customer. (Mauldin, T. 4420; Fisher, T. 1681–84).

164. Mauldin and Union Representative Cecil Casey informed McDowell of Safeway's decision to discharge her. McDowell was formally discharged on September 12, 1979. The Union refused to file a grievance over McDowell's discharge. (McDowell, T. 1851–52).

165. On September 27, 1978, McDowell applied for unemployment compensation with the Arkansas Employment Security Division. Safeway responded, on September 29, 1978, that McDowell had been dis-

charged for incivility and fighting with a customer. (Def.Exh. 3, p. 7).

166. On October 23, 1978, the Arkansas Employment Security Division disqualified McDowell from receiving unemployment compensation because she had been discharged from her job for fighting with a customer on company property, and that this act violated rules and was willful.

167. McDowell appealed the ESD's decision to an appeals referee. A hearing was held and McDowell was given the opportunity to present testimony and to cross-examine the testimony presented by Safeway. The Appeals Referee affirmed McDowell's denial of benefits finding that McDowell was "discharged from her job with [Safeway] because of engaging in a fight with a customer on Company property" and held that McDowell's actions "were against the interests of the employer and constitutes misconduct in connection with the work." (Def.Exh. 3, p. 10).

168. McDowell was notified of her right to file an appeal of the Decision of the Appeals Referee and given specific instructions on how to perfect her appeal to the Arkansas Board of Review. (Def.Exh. 3, p. 11).

169. McDowell did not file an appeal of the Decision of the Appeals Referee to the Board of Review.

170. A claimant under the Arkansas Employment Security Act has a right to appeal an adverse decision of the Arkansas Board of Review to the Arkansas Court of Appeals, a constitutional court of the State of Arkansas.

171. Plaintiff McDowell's version is contradicted by all the witnesses except Toyce May, who came forward three years after the incident. Although the customers certainly share some of the blame for this unfortunate incident, I must agree with Safeway that Ms. McDowell is at least equally blameworthy and perhaps even more to blame. I cannot fault the Company for her discharge and I find that under all the circumstances it was justified. Significantly the Union, whose representatives

were on the scene immediately after the incident, declined to process a grievance on her behalf (McDowell, T. 1851–52). After a hearing before an appeals referee, she was disqualified for unemployment compensation benefits because of misconduct (DX 3, p. 10). In arriving at the decision with regard to the discharge of Ms. McDowell, I have taken into consideration her prior work record with the Company as set out, *infra*.

172. McDowell was hired at Safeway on August 8, 1975 at the recommendation of Gerald Mauldin. McDowell's sister, Shirley Jackson, was Mauldin's secretary and had referred McDowell to Mauldin. McDowell was assigned as a part-time food clerk to Store No. 167. On September 13, 1976 McDowell was given a written warning for allowing someone else to punch her time card on the time clock. (Def.Exh. 3, p. 65). On December 27, 1976 McDowell was given a warning letter for failure to report to work as scheduled. (Def.Exh. 3, p. 69).

173. McDowell was transferred to Store No. 172 (8001 Geyer Springs) on January 9, 1977 as a part-time food clerk. James Smith, a black store manager at No. 172 at the time, testified that McDowell was sent to him because nobody could do anything with her. He stated that he had no problem with McDowell as long as he let her know what side of the bread had butter on it. (J. Smith, T. 1581).

174. On August 14, 1977 McDowell was transferred to Store No. 179 (1919 West 12th). The manager at Store No. 179 was Wayne Ward; the assistant manager was Larry Hill; and the booth cashier was Margaret Wiggs. McDowell's performance at Store No. 179 was very erratic. She was very moody and at times was a very fast checker and other times very slow. McDowell also had problems getting along with other employees. (L. Hill, T. 3480–81).

175. Shortly after transferring to Store No. 179, McDowell got into a verbal argument with a customer over whether she (McDowell) had given the proper amount of change. Hill sent McDowell out of the check stand and placated the customer.

No reprimand was issued since Hill was unable to determine who was at fault, but McDowell was instructed that she was not to try to handle a situation with an irate customer but instead to call for management. Hill testified that situations where customers make abusive remarks to checkers are expected to occur and employees are told to smile, limit their conversation to very few words, and if the customer doesn't calm down to call management. (L. Hill, T. 3481–82).

176. As booth cashier at Store No. 179, Margaret Wiggs had the duty to assign the checkers to the check stands, handle the customers, make pulls (collect money) from the cash registers, administer checkers' tests, and provide assistance to the checkers. Wiggs had problems with McDowell, who drank cokes, ate candy and chewed gum in the check stand and who did not like to take assignments from Wiggs. McDowell received a warning letter on October 7, 1977 for refusing to obey an order from Wiggs to move from checklane #1 to checklane #4 (the express lane). (Def. Exh. 3, 57; Wiggs, T. 3666–68).

177. On November 23, 1977, McDowell was issued a written warning for failure to charge a customer for toys purchased. (Def.Exh. 3, 54–55). McDowell was given this warning letter in the presence of Ward, Hill, Wiggs and Union steward Eddie Yancey, a black male. After reading the warning letter, McDowell slapped Wiggs in the face with the letter, cursed and directed racial epithets at Wiggs, and threatened to kill Wiggs if Wiggs caused her to lose her job. McDowell also threatened to sue Wiggs, Ward, and Safeway. Ward tried to explain the warning letter to McDowell and then told McDowell to return to work. When McDowell stated that she did not feel like working, Ward sent her home. Ward, Wiggs, Hill and Yancey sent a joint letter to the District Manager Clyde Godwin and Gerald Mauldin which recommended that McDowell be either transferred or discharged. (Def.Exh. 3, page 58–59; L. Hill, T. 3484–89; Wiggs, T. 3673–75).

178. Safeway periodically gives all food clerks a checker's test to insure for accuracy. A food clerk is required to ring up a basket of designated items and the register tape is then double checked against the actual cost of the items.

179. On December 30, 1977 McDowell received a written warning from Assistant Manager Larry Hill for poor performance on a checker's test which had been given to McDowell and other food clerks (Def.Exh. 3, page 47). McDowell had made seven errors out of twelve rings. Upon receiving the warning letter, McDowell became defensive, cursed Hill and threatened to sue Hill and Safeway, to harm Hill, his wife and his child, to harm Hill's car, and to tell a story in court with witnesses so believable that even Hill would believe it. Hill immediately called Godwin who told him to document McDowell's threat "word for word". (Def.Exh. 3, pp. 48–51; Hill, T. 3489–94).

180. Shortly after the December 30, 1977 warning incident, McDowell asked for permission to leave work early, because a relative of hers had been in a car wreck and was in jail. Because of other events which had occurred that evening, Hill was suspicious of the reason for McDowell's departure. After checking with the Little Rock police and finding that no one had been arrested in an incident related to a car wreck and after ascertaining that McDowell did not go to the police station as she had stated, the decision was made by Hill and Ward to discharge McDowell for lying to get off work. (Hill, T. 3494–99). Pursuant to Safeway's discharge procedures, McDowell's termination was reviewed by District Manager Clyde Godwin and Employment Relations Manager Gerald Mauldin. The decision was made not to discharge McDowell but instead to transfer her to Store No. 212 (7500 Baseline Road) and McDowell was made whole for any lost monies.

181. McDowell worked at Store No. 212 from March 19, 1978 until her discharge on September 12, 1978. On May 29, 1978, Store Manager Charles Fisher issued a warning letter to McDowell for McDowell's failure to report to work on numerous occasions and for her tardiness. (Def.Exh. 3, pp. 41–42). On May 30, 1978 McDowell again failed to report to work and received a four-day suspension. (Def.Exh. 3, pp. 43–44). Fisher issued this disciplinary suspension after discussing the matter with his district manager.

182. Prior to the incident culminating in McDowell's termination, customers had complained that McDowell was rude and unfriendly. When confronted with these complaints, McDowell lost her temper. (Fisher, T. 1747–49; Lavender, T. 3831).

183. McDowell broke three Sweeda cash registers while at Store No. 212 by pulling them off the check stand. This was the only time in Fisher's entire career with Safeway that he had ever heard of a cash register being pulled off onto the floor. McDowell was not disciplined for these incidents, but they were considered a reflection of her temper. (Fisher, T. 1749–50).

### B. *Intervenor John Nimmer*

184. Intervenor John Nimmer, black male, was hired by Safeway on January 23, 1975 as a part-time food clerk at Store 229 in Benton, Arkansas. He received the following transfers and changes in position:

| DATE | STORE/POSITION |
| --- | --- |
| March 2, 1975 | Store # 152 (5501 Kavanaugh) – Part-time food clerk |
| November 16, 1975 | Store # 152 – Full-time |
| April 18, 1976 | Store # 152 – Store manager trainee |
| August 7, 1977 | Store # 182 (165 Rodney Parham) – Store management trainee |
| March 19, 1978 | Store # 168 (7507 Cantrel) – Store Management trainee |
| June 18, 1978 | Store # 168 – Food clerk |
| January 14, 1979 | Store # 220 (10901 Rodney Parham) – Food clerk |
| January 11, 1981 | Store # 220 – Head clerk |

(Jt.Exh. 1, Stip. 30).

185. Nimmer was hired through Dixie Employment Company, who told him that Safeway was trying to find blacks to go into management positions. (Nimmer, T. 947–50).

186. On March 2, 1975 Nimmer was transferred to Store No. 152 (5501 Kava-

naugh) in Little Rock, Arkansas as a part-time food clerk under store manager Artis McDonald. On November 16, 1975 Nimmer was reclassified to a full-time food clerk. (Nimmer, T. 952–57).

187. On February 23, 1976 Nimmer received a written warning notice from store manager Artis McDonald for his failure to properly stock the reserve section for which Nimmer was responsible. (Def.Exh. 4, p. 56).

188. Shortly after his warning letter, Store No. 152 came under the jurisdiction of District Manager Clyde Godwin. Nimmer met with Godwin and requested that he be placed in the Store Management Training Program. Godwin checked with other officials at Safeway and determined that Nimmer had been promised that he would be placed into the Store Management Training Program and placed Nimmer into the program on April 18, 1976. (Godwin, T. 3064–66).

189. Nimmer's chief complaint is that he has not been made a store manager because of discriminatory obstacles placed in his path while he has been in the Store Managers Training Program. The problem is that Nimmer has received a negative rating from every supervisor under whom he has worked. The Manager of Store No. 152, Artis McDonald, testified that he recommended that Nimmer not be placed in the Store Management Training Program (T. 4856). District Manager Clyde Godwin commented as follows on his work at Store No. 152:

> Q. How would you compare Mr. Nimmer's work with the work of the other stockers that you reviewed?
>
> A. With the other stockers at that store?
>
> Q. Yeah, at that store.
>
> A. Mr. Nimmer's work didn't get completed. He never did polish off his section. He had trouble in price marking. He had trouble in housekeeping and he had trouble stocking to our standard.

(T. 3067).

190. Eloise Mahaffey later became manager of Store No. 152. On or about May 31, 1977, Mahaffey completed a Store Manager's communication to District Manager Cable in which she evaluated Nimmer's overall performance for the month of May, 1977, as being unacceptable. Mahaffey cited Nimmer for excessive back stock, repeated calls from creditors about unpaid bills, leaving his section undone and sloppy, and eating a can of soup without a sales slip in violation of company policy. (Def. Exh. 4, p. 54). During the period of time that Nimmer worked for Mahaffey, Mahaffey rated Nimmer's performance as compared with other stockers as poor. She rated Nimmer's performance as compared to what would be expected for a store management trainee as extremely poor. (Mahaffey, T. 3183–86, Def.Exh. 4, p. 54).

191. Nimmer was then transferred to Store No. 182 whose Manager was Gerald Martin. Martin testified that Nimmer was "substantially below what I would perceive to be the level of a good manager trainee" (T. 3303). Martin was later transferred to Memphis (1–1–78) and Tommy Numier became Manager of Store No. 182.

192. In February, 1978 Nimmer contacted Retail Operations Manager Unti and requested a meeting to discuss his belief that he was not receiving the training in the Store Management Training Program that he should. A meeting was held on February 16, 1978 with Nimmer, Retail Operations Manager Unti, District Manager Cable, and Employee Relations Manager Mauldin. After listening to Nimmer's complaints about his training, Unti informed Nimmer that his performance in the store management training program had been less than satisfactory but that he would agree to give Nimmer one final opportunity to progress in the program. Therefore, it was agreed that Nimmer would be transferred to a higher volume store where he could concentrate more on stocking one store area. It was agreed that he would be transferred to Store No. 168 (7507 Cantrell), because it was a high volume store and also because Store Manager Harold Trimble was one of the most respected and most able store managers in the Little

Rock Division. It was further agreed that Nimmer would be assigned as the sole person responsible for the frozen food section at Store No. 168, so that the operation of that section could be attributable solely to him. To insure a fair opportunity, an experienced employee at Store No. 168 was assigned to assist Nimmer for two weeks in cleaning and restocking the frozen food section so that it would be in complete compliance with Safeway's stocking standards when Nimmer assumed sole responsibility for maintaining that section. (Def. Exh. 4, pp. 21–23).

193. In March, 1978 Nimmer was formally transferred to Store No. 168 and assumed responsibility for maintaining the frozen food section (Def.Exh. 4, p. 20).

194. On April 27, 1978 District Manager Cable and Store Manager Trimble inspected the frozen food section with Nimmer to evaluate Nimmer's progress and found numerous violations of Safeway's stocking standards, including poor rotation and damaged merchandise. Nimmer was informed of the deficiencies and told to correct them. (Def.Exh. 4, pp. 17–19).

195. On May 18, 1978 Cable and Trimble again inspected the frozen food section with Nimmer and again found numerous deficiencies, some of which were repetitions of deficiencies found in the April 27, 1978 inspection and evaluation, such as poor rotation and damaged merchandise (Def.Exh. 4, p. 16).

196. As a result of these evaluations, District Manager Cable and Store Manager Trimble recommended that Nimmer be removed from the store management training program (Def.Exh. 4, p. 15). Nimmer was so removed on June 18, 1978.

197. Sometime after Nimmer was removed from the Store Management Training Program Clyde Godwin became the District Manager responsible for Store No. 168. Nimmer complained to Godwin that he had not been treated fairly in the Store Management Training Program, and Godwin told Nimmer that he would give him another chance to get into the program. Godwin told Nimmer that he would be transferred to another store and that if he did an outstanding job there, he would be reconsidered for the Store Management Training Program. (Godwin, T. 3069–71).

198. On January 14, 1979 Nimmer was transferred to Store No. 220 (10901 Rodney Parham). District Manager Godwin met with Nimmer and Store Manager Don Goens to discuss Nimmer's role at Store No. 220. Godwin explained Nimmer's past problems to Goens and told Nimmer that if he did an outstanding job at Store No. 220, he would reconsider him for reentry into the SMTP. Store Manager Goens then told Nimmer exactly what he expected of Nimmer as far as work habits and walked Nimmer through the section that Nimmer would be responsible for and showed Nimmer how he wanted the section worked. (Godwin, T. 3069–71).

199. On February 5, 1979 Nimmer was given a warning notice and suspended for one day because of his failure to report for work. (Def.Exh. 4, p. 13).

200. Nimmer's work performance and stocking habits continued to be below average. Goens monitored Nimmer's section, and after documenting Nimmer's sloppy stocking practices by taking pictures of Nimmer's section, Goens prepared a lengthy warning notice concerning Nimmer's poor performance. Goens called a meeting with Nimmer, District Manager Godwin, and Union Representative Hatcher to discuss the warning notice. (Godwin, T. 3071–76); Goens, T. 552–70, 629–31, 4044–53; Def.Exh. 22).

201. The warning notice contained a highly detailed description of Nimmer's poor performance with regard to pricing, stock rotation, out of stock items, sloppy work, and unworked items. Goens also cited Nimmer for failing to perform at the level of an average stocker, noting that the stocker before Nimmer had successfully completed the assignment in the allotted time. Goens also warned Nimmer for failing to help with the cleanup, causing a morale problem among the other stockers. (Def.Exh. 4, pp. 4–11).

202. District Manager Godwin went over the warning letter item by item with Nimmer. Nimmer only disagreed with one item on the warning, which Godwin then deleted. Godwin then signed the warning letter himself to impress upon Nimmer the seriousness of the situation. Godwin told Nimmer that his performance was unacceptable and that he would be discharged if he did not improve his work habits. (Godwin, T. 3076–77).

203. Store Manager Charles Fisher then became the store manager at Store No. 220 in August, 1979 (Nimmer, T. 1004).

204. The head clerk on the stocking crew at Store No. 220 resigned in January, 1981. Store Manager Fisher and District Manager Godwin discussed the vacancy; though neither manager was very happy with Nimmer's leadership abilities, they agreed to give Nimmer the head clerk job based upon his seniority. (Fisher, T. 1553, 1698–1700, 1701–02; Godwin, T. 3077).

205. As a head clerk over the stock crew, Nimmer's work performance, again while not being outstanding, has been acceptable. (Fisher, T. 1703; Godwin, T. 3077).

206. Based upon the testimony and exhibits in this case, I find that Nimmer did not perform satisfactorily in the Store Manager Training Program and that Safeway's failure to retain him was based on job performance and not race.

### C. *Intervenor Carmen Smith*

207. Four of the Intervenors, Carmen Smith, Linda Nowden, Gwendolyn Doby and Cheryl Russ, were employed at Store #258 (9800 Geyer Springs Road). Don Goens was store manager of Store #258 from September, 1979 until November, 1982. Janie Hanle was assistant manager from August, 1980 to August, 1981 and again from November, 1981 until November, 1982.

208. When Store #258 opened in September, 1979, it was the second largest Safeway Store in the entire company. With 57,000 square feet, this super store was twice the size of a conventional store.

It had nine departments compared to the three departments which the conventional stores had at the time. It had one of the first bakery-delis in the metropolitan area and was the first store with a flower shop, pharmacy, a photo-gift department and a variety department. Store #258 was a model for retail and management personnel within the division as well as for personnel from other Safeway divisions, and Goens was expected to keep the store in "grand opening" shape every day. (Goens, T. 3982–84).

209. Store #258 opened with over 160 employees as compared to 38 employees at the store which Goens had previously managed. These employees transferred in from two other stores in the area which were being closed; in addition a number of new courtesy clerks and food clerks were hired for the opening. This store also was the first Safeway store in the metropolitan area to utilize scanner registers (computerized registers which pick up the price from a code stamped on the bottom of the product). (Goens, T. 3982–84).

210. The parties stipulated that Intervenor Carmen V. Smith was hired by Safeway as a part-time food clerk at Store #258 on August 29, 1979; that Smith began working for Safeway as a trainee for Store #258 (8900 Geyer Springs), which was scheduled to open on September 23, 1979; and that Smith was discharged on September 12, 1979. (Jt.Stip. 32).

211. Smith was hired as a food clerk for Store #258 which was scheduled to open on September 23, 1979. Since Store #258 was the first "scanner" store in Pulaski County, all new employees, as well as all current employees, had to be trained on how to use the scanners before Store #258 opened. These training classes were conducted in Store #258, prior to opening, by training instructors Mike Marcussen and Sara Hill. Employees were trained in groups according to their classification and their primary job function. Smith, who was classified as a primary checker, was scheduled to receive 32 hours of training in eight 4-hour sessions and eight hours of

on-the-job training at a scanner store in Conway. The groups received instruction from either Hill or Marcussen, with each group receiving the same instructions as set out in a training outline which had been prepared by Marcussen and Hill. This outline was based on Safeway division policy and the IBM training manual for the scanner equipment. The training covered Safeway procedure and rules, use of the time clock, and common situations encountered by checkers, customer complaints and customer accidents. The training also covered register procedure on food stamps, tax, coupons and refunds. Trainees were instructed on the proper technique in using the scanner equipment. In order to operate the scanner, the trainees were required to memorize price lookup (PLU) codes for items such as produce which could not be scanned. Employees were scheduled for one and one-half to two and one-half hours register practice during each session. During this register practice time the instructors observed, evaluated and counseled with the trainees. (Hill, T. 4247–53).

212. Smith received her training from Hill who evaluated Smith's performance as poor. Beginning with the second session, trainees were assigned 20 PLU codes to memorize and were tested on a different group of 20 codes each session. Smith ranked in the bottom of her group on these tests. Smith and another employee who also performed poorly on this test were counseled by Hill; the other employee improved but Smith did not. Smith's scanning technique was also poor. (Hill, T. 4255, 4285–86; 4288–90).

213. Smith stood on the fringe of the group, or sat on the register and was inattentive in class. This inattentiveness resulted in an inability to answer questions concerning information which had been presented as well as the inability to perform procedures which had been discussed. (Hill, T. 4255, 4277–78).

214. Smith was also tardy on several occasions. (Hill, T. 4255–56). Smith admitted that she was late on at least two occasions, but contended that there were also one or two white employees who were also tardy. (Smith T. 315, 323). Hill confirmed that other employees were tardy, but that these were current employees who were scheduled to work at another store while they were training and were not able to clock out to be to their training session on time. (Hill, T. 4256).

215. Hill counseled with Smith on the fourth training session about Smith's problems with PLU codes, memorization, her performance in problem solving and scanning technique. Smith seemed unimpressed by this counseling and did not show any desire to improve. (T. 4257).

216. Store Manager Don Goens discussed the trainees' performance with Hill and reviewed the scores on the PLU tests. Smith was one of the trainees who was having difficulties. Hill had a second conversation with Goens at which time he asked if there had been any improvement in Smith's performance. Hill informed Goens that she did not see an improvement and stated that in her opinion Smith would not be a productive employee. (Hill, T. 4258–59).

217. Due to Smith's lack of interest in her job, her failure to respond to the PLU codes and her tardiness, Goens saw no future in continuing her training. Goens had observed the training classes from the catwalk above the check stands and had also discussed Smith's performance with Marcussen and Hill, upon whom he relied for an evaluation of the trainees. He also counseled Smith about the problems which she was having with the PLU codes and her tardiness. Based on his observation of Smith, Marcussen and Hill's evaluation and Smith's failure to improve after counselling, Goens terminated Smith on September 12, 1979. (Goens, T. 4025–28).

218. When Goens informed Smith he was discharging her, he offered to allow her to finish the day cleaning. (Smith, T. 308). Persons in all job classifications at Safeway are expected to perform cleaning duties, and this was particularly true during the opening of Store No. 258. (Goens, T. 3985). The Court finds that Goens' offer

to Smith was not discriminatorily motivated.

219. Smith alleged she did not receive the same attention or training as the white employees. Betty Amos, a black probationary employee in the same training group with Smith, testified that she was not neglected by Hill in the training which she received. (Amos, T. 114). Any neglect with respect to the training Smith received, either real or imagined, cannot be said to have been on the basis of race.

220. The Court finds that credible evidence supports Safeway's position that Smith was terminated after a couple of weeks for failing to satisfy her probationary period. In light of the fact that the new store was opening and many new employees were being trained, Safeway was justified in not retaining Smith for the full probationary period.

221. Safeway did not discriminate, intentionally or otherwise, against Smith because of her race in any of its employment policies.

### D. *Intervenor Cheryl Russ*

222. The parties jointly stipulated that Intervenor Cheryl Russ, Black female, was hired by Safeway as a part-time courtesy clerk (bagger) at Store # 258 (8900 Geyer Springs) on September 26, 1979, and that Russ' employment history at Safeway was as follows:

| DATE | STORE/POSITION |
| --- | --- |
| October 11, 1980 | Military Leave of Absence |
| March 21, 1981 | Return to Store 258 – Part-time Courtesy Clerk |

Russ' employment was terminated on April 18, 1981. (Jt.Stip. 31).

223. Russ alleged in her Petition for Intervention that she was denied a promotion from courtesy clerk to cashier (variety clerk) while white employees with less seniority received such promotions. She further alleged that white employees who received these promotions have relatives who work for Safeway. Russ did not testify on her own behalf, nor was any evidence presented in support of these allegations.

224. During Russ' period of employment at Safeway Store # 258, seven employees in Russ' classification (courtesy clerk) received promotions to variety clerk, food clerk or deli clerk. Five of these employees were white and two were black; each of the employees receiving the promotion had more seniority than Russ. (Mauldin, T. 4380; Def.Exh. 32).

225. None of these courtesy clerks who received promotions from part-time courtesy clerk to part-time variety clerk, food clerk or deli clerk have relatives that work for Safeway. (Cf. Def.Exh. 32 with Def. Exh. 48 and Plf.Exh. 83).

226. Russ voluntarily terminated her employment at Safeway on April 18, 1981. (Def.Exh. 9, p. 1).

227. Safeway did not discriminate, intentionally or otherwise, against Russ because of her race in any of its employment policies.

### E. *Intervenor Linda Nowden*

228. The parties stipulated that Intervenor Linda Nowden, black female, was hired by Safeway on August 6, 1975 at Store # 168 (7507 Cantrell) as a part-time food clerk. Nowden's subsequent employment history at Safeway is as follows:

| DATE | STORE/POSITION |
| --- | --- |
| September 23 1979 | Store 258 (7511 Baseline) – Part-Time Food Clerk |
| August 17, 1980 | Store 258 – Full-time Food Clerk |
| September 28, 1980 | Store 258 – Full-time Food Clerk |
| November 2, 1980 | Store 258 – Full-time Food Clerk |
| March 1, 1981 | Store 258 – Full-time Food Clerk |
| November 15, 1981 | Store 258 – Full-time Food Clerk |

Nowden took leaves of absence on the following dates:

March 5, 1977 through July 16, 1977

February 4, 1979 through June 10, 1979

July 19, 1981 through October 13, 1981

229. Nowden applied at the Little Rock Division Office for a position and was scheduled for an interview on the same day. She was interviewed by Gene Eggman who sent her to two stores in the Heights area of Little Rock. She was hired at Store # 168 (7507 Cantrell) by Store Manager Harold Trimble, as a part-

time food clerk and began work the following Monday. (Nowden, T. 1120–24).

230. Nowden requested a transfer to the new Super Store # 258 and was granted the transfer. (Nowden, T. 122, 124–25). Simultaneously with the opening of Store # 258, two conventional Safeway Stores in the area, Store # 212 (7511 Baleline) and Store # 172 (Geyer Springs and I–30), were being closed. Nowden was one of the employees temporarily assigned to Store # 212 during this transition period which lasted for approximately three weeks. (Nowden, T. 1135, 1225–27; Goens, T. 3982; Hanle, T. 3914–15).

231. Nowden alleged that during this transition period and while she was at Store No. 212 and later at No. 258, she received fewer hours than less senior whites because of race. I find that these allegations are not supported by the record in this case. She also claimed that she was denied assignments because of race and that she was assigned to midnight shifts because of race. I find that her allegations are contrary to the credible evidence in this case.

232. Nowden alleged that white employees with less seniority than she had were made full-time. In support of this allegation Nowden introduced Plaintiff's Exhibit 10 which lists 21 white employees hired after Nowden who achieved full-time seniority prior to Nowden. Not included on this exhibit were the names of seven black employees hired after Nowden who also achieved full-time status prior to Nowden. (Defendant's Exhibit 33). Defendant's Exhibit 34 combines these two exhibits and articulates the reason that each of these 28 employees achieved full-time seniority. (Defendant's Exhibit 34). Each of the reasons articulated is a valid exception to the seniority provisions governing full-time reclassification. The Union contract provides that if a vacancy occurs for a full-time job, the job must be filled by the most senior available part-time employees in the city (Little Rock, North Little Rock, and Jacksonville). There are exceptions to this provision: When an employee works 40 hours

for four consecutive weeks, he is automatically reclassified by operation of the contract; by promotion to a classification which requires a full-time employee such as Head Clerk, Department Manager or Store Management Training Program; when there is no experienced part-time employee available to fill the position, such as when the super stores opened with new Bakeries/Delis and Flower Shops, experienced individuals from outside Safeway were hired into full-time positions; or when the most senior part-time employee is not willing to take the position as in the case of night stocker positions. (Mauldin, T. 4381–85). The Union contract also provides that full-time employees of one bargaining unit in the Little Rock Division transferring to another bargaining unit in the Little Rock Division retain full-time seniority. (T. 4385). Nowden failed to prove these allegations and Safeway showed by clear evidence that the reclassifications were not based on race.

233. Dena Cable, a white employee, was placed into the SMTP, given full-time classification, and retained her full-time classification after she was removed from the training program and reclassified as a Food Clerk. Nowden alleged that Cable's entry into the SMTP was merely a subterfuge for attaining full-time seniority. Once an employee achieves full-time seniority through a promotion, he does not lose this seniority if he is subsequently demoted. (Mauldin, T. 4385). Ten employees have been reclassified from part-time to full-time upon their entry into the SMTP. Four of these employees, two blacks and two whites, failed to complete the SMTP and all four retained his or her full-time status. (Mauldin, T. 4409; Def.Exh. 39). The Court rejects this allegation as not being supported by the evidence.

234. Nowden alleged that Kathy Waldorf was hired after Nowden and reclassified to full-time prior to Nowden. Waldorf was hired as a Variety Clerk, and therefore Waldorf's movement to full-time would be according to the Variety Clerk's seniority

list rather than the food clerk seniority list. (Def.Exh. 2C, p. 718).

235. Nowden alleged that after being evaluated to a full-time food clerk she was "demoted" to part-time food clerk on two occasions. Nowden wrote Gerald Mauldin on May 15, 1980 requesting full-time status. As a result of this request, Nowden was elevated to full-time status on August 17, 1980. Mauldin made the decision to elevate Nowden when he realized that Gloria King, had been elevated to full-time with less seniority than Nowden. Gloria King was the wife of Marion King a black Store Manager, who had been transferred from Pine Bluff to a Little Rock store. Since his wife also worked for Safeway, it was arranged for her to transfer to a Little Rock store and be elevated from part-time to full-time. (Mauldin, T. 4387). Mauldin contacted Store # 258 and Nowden's reclassification was made by Assistant Manager Robert Gunther while Store Manager Goens was on vacation. (Nowden, T. 1144–45; Goens, T. 3997–98). On September 28, 1980 Goens was directed by his District Manager to reclassify Nowden to part-time because poor economic conditions had created more employees than the number of hours available to be scheduled. (Nowden, T. 1240–41; Goens, T. 3998–99). The decision to reclassify employees from full-time to part-time is made by the division office and such reclassification is on the basis of county-wide, full-time seniority, as opposed to company seniority. Such reclassification usually occurs when, due to poor economic conditions, a store closes or hours within a store are reduced. (Mauldin, T. 4409–10; Goens, T. 3996).

236. Nowden did not accept Goens' explanation that she was classified due to lack of work and cited in support of this the fact that three white employees, Charles Patterson, Mike VanPelt and Britt Morris, had all transferred into Store # 258. Patterson was hired on September 28, 1970, and achieved full-time status on October 6, 1974; both dates were prior to Nowden's employment at Safeway. Patterson transferred to Store # 258 on February 22, 1981 from Store # 266 (4109 E. Broadway). (Def.Exh. 2, p. 551).

237. Mike VanPelt was hired on May 7, 1973 and achieved full-time seniority at Store # 182 on April 9, 1978. As a result VanPelt transferred to Store # 258 from Store # 4006 on October 12, 1980 and retained his full-time status based upon his seniority. (Def.Exh. 2, p. 711; Goens, T. 4000).

238. Britt Morris transferred from Store # 255 (Conway) at the opening of Store # 258. He had achieved full-time seniority in Conway and pursuant to the Union contract, retained this seniority when he transferred. (Mauldin, T. 4385; Goens, T. 4000; Def.Exh. 2, p. 512).

239. Nowden filed a Union grievance protesting her reclassification. As a result of this grievance, a meeting was held with management and the Union and Nowden was reclassified to full-time on November 13, 1980, retaining her full-time seniority date of August 17, 1980. (Nowden, T. 1151–53). At the time of Nowden's reclassification there were three less senior full-time employees who were not reclassified who had slightly less full-time seniority than Nowden. All three of these employees were night stockers, two were white and one was black. (Mauldin, T. 4411; Def.Exh. 40). The Court finds that Nowden was not the victim of race discrimination in this reclassification.

240. Nowden retained her full-time seniority until March 1, 1981 when she was again reclassified to part-time. Store Manager Goens was very upset about this reclassification, but when he protested to his district manager he was assured that seniority had been followed "right down the line." This second reclassification was due to city-wide poor economic conditions and Nowden was, in fact, the least senior full-time employee in the county. (Goens, T. 4002; Def.Exh. 40). Nowden again contacted the Union, but since she was the least senior full-time employee the Union did not take any action. (Nowden, T. 1161–63).

241.  Nowden took a maternity leave beginning July 19, 1981 and returned on October 13, 1981.  She was reclassified to full-time several weeks after her return from her maternity leave (Nowden, T. 1248–50; Goens, T. 4003) and has retained her full-time seniority.

### F.  *Intervenor Gwendolyn Doby*

242.  The parties stipulated that Gwendolyn Doby, a black female, was hired by Safeway as a part-time employee in Store # 258's Bakery/Deli Department on September 19, 1979; and that Doby's last day of work at Safeway was October 29, 1980.  It was further stipulated that Doby was injured while on the job on June 24, 1980; that she was reinjured on August 10, 1980 and twice in the latter part of October, 1980;  and that Doby presented the following physician's releases to Safeway:

| DATE | PHYSICIAN | TYPE RELEASE |
| --- | --- | --- |
| July 15, 1980 | Thomas R. Rooney | Full Duty |
| August 14, 1980 | Thomas R. Rooney | Full Duty |
| October 29, 1980 | Joe K. Lester | Full Duty |
| November 6, 1980 | Joe K. Lester | Light Duty |

(Jt.Stips. 35, 36).

243.  Doby applied for a part-time position as a cook.  (Def.Exh. 7, p. 30).  She was interviewed by store manager Don Goens and Gene Eggman and was hired as a part-time deli clerk.  Doby was not promised that she would be "head cook".  John Campea, a white male, was also hired as a part-time deli clerk in the Bakery/Deli.  Both Doby and Campea were hired at the same classification and salary and both began work on September 19, 1979 at the time of the opening of the new Super Store # 258.  (Goens, T. 4003–04; Def.Exh. 2–A, pp. 112, 188).

244.  The bakery-deli at Store # 258 was two departments under the supervision of one manager.  Since this was only the second bakery-deli in Pulaski County, Safeway had to go outside to hire deli-clerks.  There were a total of 12 to 14 deli clerks hired for both departments.  Three full-time employees, all with prior deli experience at Krogers, were hired; all other deli clerks were part-time.  Although each deli clerk had a primary function, the first primary function for all deli clerks was customer assistance.  In addition, all deli clerks, as well as the deli manager, were responsible for cleaning up after themselves and others and straightening up the store room.  The only exceptions to this were the cake decorators.  Goens had given explicit orders that, because of the high mark up on bakery items, the decorators were not to perform any functions other than decorating.  (Goens, T. 4004–05; Waldorf, 4162, 4166–68, 4171, 4211).

245.  Doby alleged that employees with less seniority were receiving more hours than she was receiving.  (Doby, T. 769).

246.  At the opening of Store # 258, the bakery deli was assigned 500 man hours per week.  As a result, all part-time employees were working approximately 38 hours per week.  Later, as the economy worsened and business declined in the entire store, the number of allotted hours decreased to approximately 250.  Doby, as well as other part-time deli clerks, complained to the Bakery-Deli Manager Ray Waldorf and Store Manager Goens.  This decrease in the number of allotted hours also impacted on Doby's work assignments.  Because of the labor factor involved, Doby was required to prepare commercially frozen entrees as opposed to "home-styled" cooking.  The reason for the decrease in hours as well as the change in cooking assignments was explained to Doby by Goens and Waldorf.

247.  When Goens received a complaint from Doby that less senior employees were receiving more hours, he investigated this complaint by pulling the employees' time cards.  He found that on some occasions some employees had worked more hours.  Goens then looked at the schedules and confirmed that Doby was never scheduled less hours than less senior deli clerks.  Goens explained to Doby how a less senior employee could receive more total hours because of unscheduled call-in hours.  (Goens, T. 4006–08; Waldorf, T. 4172–76).

248.  The hours of part-time deli clerk employees were scheduled by seniority.  However, because of unscheduled call-in

hours a less senior employee may actually work more hours in a particular week. A comparison of Doby's part-time hours with those of other part-time deli clerks reveals that she received more hours than some more senior deli clerks and that she received less hours than some less senior deli clerks. (Def.Exh. 43).

249. Doby requested full-time status on May 12, 1980. (Def.Exh. 7, p. 20). There were no full-time vacancies in Doby's classification from the time this request was made until her employment terminated. (Mauldin, T. 4402).

250. Doby alleged that she requested and was denied a transfer to a food clerk (checker) position. It was explained to Doby by both Waldorf and Goens that deli clerks performed functions which required special skills and training. (Goens, T. 4008–09; Waldorf, T. 4170–71, 4196, 4200–01). Since Safeway was new in the bakery/deli area and had no employees with this experience, persons had been hired from the outside or from other grocery chains with experience. Safeway was not willing to lose this expertise by allowing transfers out of the bakery/deli. Whites had also requested transfers out of the Deli and been refused. (Mauldin, T. 43372–73, 4465). There was no evidence presented that any deli clerk had ever been permitted to transfer to a food clerk position.

251. Doby alleged that she requested a promotion to assistant deli manager and that Gail Barrett and James Eichler, white employees, received these promotions. Safeway does not have an assistant deli manager position and Doby was informed of this. (Goens, T. 4008; Waldorf, T. 4169).

252. James Eichler had been a construction foreman for Safeway and his job had been phased out. Eichler lived in Pine Bluff and requested that he be considered for the manager of the bakery-deli at a store to be constructed in Pine Bluff. Since there were no trained personnel for the position in Pine Bluff and because Eichler had a background in retail sales, he was placed at Store # 258 to train for the position at the Pine Bluff store. Eichler did not work out as expected and was ultimately taken out of training and transferred to Pine Bluff as a night stocker. (Mauldin, T. 4373–74).

253. Gail Barrett was classified the same as Doby, but had more seniority. On occasion, Barrett was placed in charge of the deli/bakery when the manager was away. (Mauldin, T. 4374).

254. Doby alleged that she was not treated equally with whites with regard to training on other deli clerk functions. When Doby requested training on doughnut frying, Goens contacted the Division Office and was allotted special hours designated for training which were to be charged to the Division Office. After training in this position for a period of time, Doby asked to be placed back on cooking because the doughnut frying was too hot. Doby was also given an opportunity to work at the meat case making sandwiches, and she again asked to go back to cooking. (Goens, T. 4011; Waldorf, T. 4168–69).

255. Doby alleged that she was hired as "head cook", but was required to clean up after herself and others. In particular, Doby complained that Elda Carter did not clean the ovens and that Barbara Francis, a cake decorator, did not clean her utensils. All employees, including Waldorf, performed cleaning functions; the only exception was the cake decorator who, because of the high profit of bakery items, was instructed by Goens not to spend any time cleaning. As a result of the complaints made by Doby, the other employees perceived that she was given preferential treatment by Goens and Waldorf. These employees called a meeting to protest this preferential treatment. As a result of this meeting, Waldorf began rotating the shifts so that Doby was not always scheduled on what other employees considered the "best shift." (Goens, T. 4005, 4009–12; Waldorf, T. 4167, 4173).

256. Although Doby complained about her working conditions, shifts, and number of hours worked, she never complained to either Waldorf or Goens that she was being

racially harassed by other employees. (Goens, T. 4012; Waldorf, T. 4176).

257. Doby received an injury to her back on June 24, 1980 and returned to work on July 15, 1980. She was not assigned more strenuous duties by Waldorf after her accident as she alleged. (Waldorf, T. 4180).

258. Doby alleged that she was discriminated against with regard to discipline. When she reported to work in a bright yellow tank top which she was wearing without a bra, Doby received a verbal reprimand for her failure to observe Safeway's dress code. Waldorf considered this top to be distasteful and revealing and asked that the assistant manager, Janie Hanle, speak to Doby. Hanle agreed that the top was indecent and asked Doby to put her uniform smock top over the tank top. Doby stated that it was too hot to wear the smock. Hanle then gave Doby a choice of putting on the smock top or going home and changing into something more appropriate for work. Doby left and did not return to work that day. When Doby did not return, Hanle pulled Doby's time card and placed it on Goens' desk (with a note explaining what had happened) so that Doby would speak with Goens before clocking in. Hanle did not send Doby home, she did not pull Doby's card and punch out for Doby, nor did she tell Doby she was terminated. Goens did have a dress policy which had been enforced in the past against whites. (Waldorf, T. 1478–79; Hanle, T. 2923–26; Goens, T. 4016–17).

259. Doby received a warning letter on August 15, 1980 from Goens for her failure to report to work as scheduled or to call in. (Def.Exh. 7, pp. 10–14). Goens had been informed by Waldorf that Doby was again having problems with her back. Goens contacted Doby by telephone and suggested that she return to see her doctor. At this time Doby did not inform Goens that she would not be at work as scheduled on Thursday, August 14, 1980. (Goens, T. 4013–14; Waldorf, T. 4177).

260. Doby simultaneously filed two grievances with the Union as a result of the tank top verbal reprimand and the August 15, 1980 warning letter. (Def.Exh. 7, pp. 15–19; Waldorf, T. 4177; Goens, T. 4018). The Court finds that these two incidents were not racially motivated and that it is doubtful that Doby was even harmed by either incident.

261. In late October Doby again missed work because of problems with her back. When Doby presented a release from her physician for light duty work, she was informed that there was no light duty work available in a grocery store and that under Safeway's policy she could not return to work until she had a full release. Although Doby alleges that she sought reinstatement, she never presented either Waldorf or Goens with a return to full duty Release, nor did she contact either to inform them that she was ready to return to work. Doby alleged that a white deli employee, Cindy May, had been given light duty. May had presented Goens with a light duty release, and he had informed her, just as he had informed Doby, that she would have to have a release to full duty work. Waldorf never gave any deli clerk light duty assignments. (Goens, T. 4018–21; Waldorf, T. 4180–81).

262. Doby testified that she received workers' compensation benefits from the time she was released to light duty work until the physician said her period of healing was over. (Doby, T. 796–98, 4422; Mauldin, T. 4468).

263. Doby's physician released her to full duty on January 7, 1981. (Doby, T. 833; 4771–76). Although Doby alleged she sought reinstatement after this release, she admitted that she had testified in an earlier workers' compensation hearing that she didn't attempt to return to Safeway after January 7, 1981 and that at this time she had already begun beautician school.

264. Doby alleged at trial (but not in her complaint or EEOC charge) that she was terminated on November 12, 1980 while under the care of a physician. Employment Relations Manager Gerald Mauldin testified that Doby was not terminated in November, 1980 because it was thought

she might recover sufficiently to return to work. However, Doby did not contact Mauldin and he had no further contact with her until he attended Doby's worker's compensation hearing in October, 1981. When Mauldin heard Doby testify that she had resigned from Safeway and enrolled in beauty school because she could no longer physically perform the job duties, Mauldin directed that the paperwork on Doby's resignation be completed. (Mauldin, T. 4421, 4469). Doby was terminated on October 16, 1981 effective the last day she worked, November 20, 1980. According to Safeway's records, this termination was coded as "resigned—unable to meet physical requirements of the job." (Def.Exh. 7, p. 21). Dr. Welch, for purposes of his discharge analysis treated all terminations coded as this reason as a discharge. Therefore, Doby's termination was included in Welch's analysis and on Defendant's Exhibit 45 on post-probationary discharges even though Safeway considered it a resignation. (Mauldin, T. 4452–57).

265. In addition to the Plaintiff and Intervenors in this action, there were white employees at Store #258 who were dissatisfied with conditions and management.

### G. Intervenor James King

266. The Distribution Center for the Little Rock Division of Safeway is located in Little Rock, Arkansas. The Distribution Center is made up of a warehouse for the products sold in the retail stores, a trucking department, and a truck repair shop. (Mauldin, T. 4342).

267. The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 878 has been the exclusive bargaining representative for all employees at the distribution center since approximately 1956. The terms and conditions of employment of the employees in the distribution center bargaining unit have been set forth in a series of collective bargaining agreements between Safeway and Teamsters Local 878. The Teamsters Union has not been joined as a party. (Jt.Exh. 1, Stip. 14).

268. Intervenor King is a member of the Teamsters Bargaining Unit. (Jt.Exh. 1, Stip. 15).

269. Intervenor King was hired by Safeway on May 1, 1978 as a full-time serviceman at the Distribution Center. (Jt. Exh. 1, Stip. 37). The duties of a serviceman include the fixing of flats, greasing of trucks, changing of tires, washing of trucks, checking bearings, and general cleanup. (Willard, T. 2763).

270. The qualifications to be a serviceman at Safeway's distribution center are that an applicant must be able to maneuver the tractor/trailer equipment and must have been around tractor/trailer rigs. An applicant can be trained for the rest of the duties of a serviceman. (Willard, T. 2764).

271. James King possessed the necessary qualifications to be a serviceman at Safeway. (Def.Exh. 30, King Application).

272. Shortly after Intervenor King went to work as a serviceman for Safeway, he requested a transfer to a truck driving position. His first request was to Merrell Williams. Williams told King that he did not think the Union contract would allow such a transfer. (Williams, T. 2874).

273. King later checked with Dub Carpenter, and then checked with Distribution Center Manager Roy Morris. (King, T. 648–49). Morris told King that the seniority provisions of the Union contract prohibited the transfer of an employee from one department in the Distribution Center to another department in the Distribution Center. Morris therefore denied King's request for a transfer. (Morris, T. 2980).

274. King also contacted Employment Relations Manager Mauldin and EEOC officer Spoon concerning his request for a transfer. Mauldin also informed King that, as a member of the Teamsters Bargaining Unit, he was not allowed to transfer from one department in the Distribution Center to another department in the Distribution Center. (King, T. 650).

275. Intervenor King was not allowed to transfer from his serviceman position to a job as a truck driver because of the

seniority provisions of the Union contract between Safeway and the Teamsters Union. (Donovan, T. 3015–18, 3048, 3053–57). This evidence was uncontroverted.

276. Intervenor King also made a request to be promoted from serviceman to heavy duty mechanic within the Truck Repair Shop.

277. The job duties of a heavy duty mechanic are to perform all jobs necessary to keep the trucks in running condition, including the rebuilding of engines, transmissions and electrical systems. Some heavy duty mechanics may specialize in areas such as refrigeration. However, all heavy duty mechanics must have mechanical aptitude and be able to do what is asked of them. (Willard, T. 2762).

278. The minimum qualifications for a heavy duty mechanic at Safeway are that the applicant must have had experience at a reputable truck repair shop and must have a set of tools.

279. The requirement that an applicant for a heavy duty mechanic job must have experience with a reputable truck shop is necessary because Safeway has no in-house training program for heavy duty mechanics. Since Safeway does not have the ability to train heavy duty mechanics, for efficiency and safety reasons, Safeway requires that heavy duty mechanics have prior experience in a reputable truck shop. Further, Safeway pays "top-dollar" for heavy-duty mechanics and expects them to be fully qualified. (Willard, T. 2762–63; Morris, T. 2981; Donovan, T. 3035–36).

280. Safeway's requirement that heavy duty mechanics have a set of tools is necessary because Safeway does not provide hand tools for its heavy duty mechanics. There is no minimum or maximum on the amount of tools necessary, so long as the heavy duty mechanic has a sufficient number of tools to perform the job of heavy duty mechanic without having to borrow hand tools from other heavy duty mechanics. (Willard, T. 2762–63; Williams, T. 2876–77).

281. Intervenor James King had never worked as a heavy duty mechanic at a reputable truck repair shop.

282. Intervenor James King did not have a set of hand tools. (King, T. 683–84, 700).

283. Intervenor James King was not qualified, under Safeway's standards, to be a heavy duty mechanic. (Williams, T. 2887).

284. During Intervenor King's employment with Safeway, Safeway has hired four heavy duty mechanics and abolished the light duty mechanic position by reclassifying the existing light duty mechanics to heavy duty mechanics. (Willard, T. 2764–69).

285. In June, 1978, one month after Intervenor King had been hired, Safeway reclassified John Monhoff from light duty mechanic to heavy duty mechanic. Monhoff had been performing heavy duty mechanic duties and was simply reclassified to reflect that fact. Monhoff was the only light duty mechanic the Little Rock Division had ever hired. Safeway's Little Rock Division saw no need for a light duty mechanic and consequently no one else was hired in that classification. No vacancy ever existed as this was simply a reclassification. Intervenor King did not express any interest in obtaining either of these positions. (Willard, T. 2764–65; King, T. 681–83).

286. In August, 1978 Safeway hired witness Gerald Burkes as a heavy duty mechanic. Burkes had worked at the Affiliated Food's truck shop for five years on refrigeration equipment and had attended the Thermal King Refrigeration School. All of Safeway's refrigeration equipment is Thermal King. (Willard, T. 2768–69; Williams, T. 2885–86; Def.Exh. 30, Burkes' Application).

287. Burkes was qualified as a heavy duty mechanic.

288. Intervenor King did not express any interest in the job vacancy filled by Burkes.

289. Later in August of 1978, Safeway hired witness Walters as a heavy duty mechanic. Walters had years of experience working on Cummins engines at Peterbilt and Cummins in Fort Smith. Almost all of the power plants in Safeway's road fleet are powered by Cummins engines. Also, Walters had experience as a shop supervisor. (Willard, T. 2768–69; Williams, T. 2886; Def.Exh. 30, Walters' Application).

290. Walters was qualified to be a heavy duty mechanic. (Williams, T. 2887).

291. Intervenor King did not express any interest in the job vacancy filled by Walters. (King, T. 681–83).

292. On November 28, 1978 heavy duty mechanic Yarberry quit his job. Because of a decreased workload, Safeway did not replace Yarberry until March 12, 1979 when Safeway hired witness Moody Bird. Bird had worked for eight years as a heavy duty mechanic at L & S Concrete. (Def. Exh. 30; Williams, T. 2879–82; Willard, T. 2765–67).

293. Bird was qualified as a heavy duty mechanic. (Williams, T. 2887).

294. Between the time Yarberry quit and Bird was hired, Intervenor King and other servicemen expressed an interest in one of the servicemen getting the heavy duty mechanic job. The servicemen obtained a meeting with a Union representative and Shop Superintendent Williams and Trucking Manager Carpenter. Williams and Carpenter explained to the servicemen and to the Union that Safeway could not train heavy duty mechanics and that the servicemen were not qualified as heavy duty mechanics because none had previous experience as a heavy duty mechanic in a reputable shop nor a sufficient amount of tools. The Union and the Company agreed upon a procedure whereby the Union would secure a test from Dallas that was being used at Arkansas Best Freight Company to determine the aptitude of the servicemen to become heavy duty mechanics. The Union would secure the test and Safeway would provide the facilities for administering the test. The servicemen were to pay $25.00 to take the test. (Williams, T. 2875–76; Def. Exh. 6, pp. 18, 26–27).

295. In addition to successfully completing the aptitude test, the servicemen were told that they would have to have a sufficient number of tools to perform as a heavy duty mechanic. King alleges that he was told that he would have to have $1,500.00 worth of tools. However, King did not have any tools and admitted himself that it would require at least $2,500.00 worth of tools to perform satisfactorily as a heavy duty mechanic.

296. Neither King nor any of the other servicemen asked for the opportunity to take the aptitude test. (King, T. 685–86).

297. Subsequently Bird was hired on March 12, 1979, as a heavy duty mechanic. (Def.Exh. 30).

298. On May 2, 1979 heavy duty mechanic Kerr quit his job. Kerr's vacancy was filled by George Jackson, a black male, on June 11, 1979. Jackson had worked for approximately four years as a heavy duty diesel mechanic at Pulaski Equipment Company prior to going to work at Safeway. (Willard, T. 2767–68; Williams, T. 2884–85; Def.Exh. 30, Jackson Application).

299. Jackson was qualified as a heavy duty mechanic.

300. Pursuant to the Union's contract, all jobs in the distribution center are posted every six months for employees to bid on their preference of shifts within their job classifications. These postings are not a job bid for vacancies or promotions, but solely a bid for preference of shift within the employee's current job classification. (Willard, T. 2769–72).

301. Shortly after Jackson was hired by Safeway, the shift bids were posted. When Jackson's seniority turn came for bidding on a shift, King placed his own name on Jackson's shift bid. Although this procedure was not appropriate, Safeway then met with Intervenor King and the Union and agreed to put King on a thirty day probationary period as a heavy duty mechanic. Jackson was then rescheduled

to do King's serviceman job. (Willard, T. 2772–74).

302. Prior to his probationary period, Intervenor King had the worst attendance and safety record of any serviceman or mechanic in the truck repair shop. (Willard, T. 2779).

303. During his probationary period King injured himself twice. First King cut his hand and had to be off work for two days. Then King fell out of a truck and had to miss eight days of work. (Willard, T. 2779).

304. Safeway, on its own accord, asked the Union for permission to extend King's probationary period so that King would get a full thirty days on the job to prove whether he was qualified to be a heavy duty mechanic. The Union agreed to this extension. (Williams, T. 2878–79; Def.Exh. 6, p. 21).

305. Intervenor King's performance during his probationary period was supervised by Shop Supervisor Willard. Willard evaluated King's performance during his probationary period as very poor and unacceptable. King continually had to seek help on how to perform certain jobs. Further, King, under the direct supervision of Willard, was still unable to perform certain jobs. In particular, King installed the liners wrong in a Cummins engine, failed to properly diagnose electrical problems on a number of trucks, failed to follow Willard's instructions concerning the repair of a transmission resulting in additional gears having to be replaced, and then failed to replace the sealing ring on a spin-off fuel filter. (Willard, T. 2774–79; Def.Exh. 6, p. 2023).

306. At the conclusion of King's probationary period, shop supervisor Willard recommended that King be disqualified as a heavy duty mechanic and returned to his former position as a serviceman. Shop Superintendent Williams and Trucking Manager Carpenter concurred in Willard's recommendation, and King was disqualified as a heavy duty mechanic. (Willard, T. 2781; Def.Exh. 6, pp. 22–23).

307. After King was disqualified as a heavy duty mechanic, King was replaced by George Jackson, a qualified heavy duty mechanic, who, like King, is black. (Willard, T. 2782; Williams, T. 2887).

308. King was taken out of the position of heavy duty mechanic because of his poor attendance, safety, and job performance during his thirty day probationary period. (Willard, T. 2779). Intervenor King then filed a grievance with the Teamsters Union stating that he had been wrongfully denied a transfer to a job as a truck driver and had been wrongfully disqualified as a heavy duty mechanic. (Def.Exh. 6, pp. 24–25).

309. The Union processed the grievance through the contractual steps to the grievance committee. The grievance committee is made up of two representatives of Safeway and two representatives from the Union. Evidence is presented to this committee and the committee votes on the disposition of the grievances. If the grievance committee vote is a tie, the issue goes to a normal arbitration procedure. After hearing King's allegations, the grievance committee unanimously voted to deny his grievance, finding that the Union contract prohibited a transfer from one department within the bargaining unit to another department within the bargaining unit and that he was not qualified as a heavy duty mechanic. The committee also denied King's grievance alleging racial discrimination. King made no effort to prove that the grievance procedure was pretextual nor did he ever make any claim against the Teamsters Union. (Donovan, T. 3018–22, 3043; King, T. 678–696).

310. Intervenor King also alleged that Shop Superintendent Williams harassed him in retaliation for having filed an EEOC charge against Safeway. King stated that he filed yet another grievance with the Union alleging racial harassment for filing his EEOC charge. King did file a grievance alleging that the shop superintendent was harassing him; however, the grievance did not in any way allege that the harassment was racially motivated, or in any way

retaliatory for filing an EEOC charge. (Def.Exh. 6, p. 28). The grievance was settled between the Union and the Company to the satisfaction of all parties. (King, T. 697–99).

311. The Court finds that the various things that happened to King were not related to his race and many were either due to or at least sanctioned by the Union contract. There was absolutely no evidence introduced that the Union contract was a mere pretext for racial discrimination. The Court also notes that King has never made any claim of discrimination against the Union nor did he name them as a party. The Court finds that Safeway acted in good faith reliance upon the Union contract and was entitled to do so.

## CLASS MEMBER WITNESSES

### A. *Vivica Wilson*

312. Vivica Wilson, who was hired on August 29, 1979 as a part-time food clerk for the opening of the new super store No. 258, alleged that she was discriminatorily discharged during her probationary period. Wilson was a college student at Henderson State University and was scheduled to student teach daily in Arkadelphia for a period of four months. After attending four training sessions on the scanner equipment, Wilson informed Store Manager Don Goens that she was student teaching and that her hours at Safeway would have to be scheduled around this teaching. Wilson was available to work twelve to fifteen hours per week during this period. Goens informed Wilson that because of the distance involved (62 miles from Little Rock to Arkadelphia) she could not be depended upon to be at work and that he was terminating her employment. (V. Wilson, T. 10–15, 33–34). The paper work completed by Goens at the time of Wilson's termination indicated that she was terminated because he was dissatisfied with the conditions which she placed on scheduling. (Def.Exh. 46, 52).

313. Although Wilson named several white employees who worked at a Little Rock store and commuted to a town outside Little Rock, there was no evidence that any of these employees were student teaching at the time of their employment or that they placed conditions on the hours which they could work.

314. The Court finds that Wilson was terminated during her probationary period for a legitimate non-discriminatory reason and not on the basis of her race.

### B. *Betty Amos*

315. Betty Amos alleged that she was discriminatorily discharged from Store No. 258 during her probationary period. Amos was hired as a part-time food clerk for the opening of super store No. 258 and was assigned to a training group under Training Instructor Sarah Hill. After attending approximately six training sessions, Amos was terminated by Store Manager Don Goens who stated that she was not progressing as she should. Amos admitted that she had trouble memorizing the required PLU codes on which she was tested and also had problems on mastering the scanning technique. (Amos, T. 104–05, 110–11). Goens observed that Amos tried very hard but she had problems with the PLU codes and the training program was too complicated for her. (Goens, T. 4032).

316. Amos testified that she was not neglected by Hill in the training which she received but felt that Safeway did not allow enough training time for employees to master the program. (Amos, T. 114). Employees in Amos' classification who were designated as primary checkers, all received the identical training. (S. Hill, T. 4249–50, 4281).

317. Amos by her own admission has failed to establish that she was qualified to complete the training session scheduled for the opening of Store No. 258. Further, Safeway has articulated a legitimate business reason for its discharge by stating that Amos was not progressing as fast as was expected.

### C. *Olivia White*

318. Olivia White alleged that she was terminated by Assistant Manager Larry

Hill during her probationary period and that she had not been informed that her work was unsatisfactory prior to this termination nor was she given a reason for her termination. (White, T. 142–43, 149–51; 154).

319. White was hired as a courtesy clerk at Store No. 168 (Cantrell and Mississippi) on September 8, 1981 and was terminated on October 5, 1981. White's duties as courtesy clerk included sacking groceries, carrying out groceries, keeping the front area clean, and racking bottles in the back of the store. (White, T. 139–41). In addition, one of the most important duties of a courtesy clerk was to foster customer relations by greeting and assisting customers cheerfully. (L. Hill, T. 3474–75). Hill discharged White for her poor performance which included White's lack of enthusiasm in assisting customers, and her slowness in performing job functions. Prior to discharging White, Hill discussed her performance with her on three occasions. When she showed no improvement, he terminated her. (Hill, T. 3474–79). The Court credits Hill's testimony.

320. White alleged that she was harassed by white customers on two occasions. On one occasion she was cursed by two girls who attempted to hit her with a car in the parking lot. On another occasion, White alleged she was pushed by a white customer while she was placing bread on the bread racks. (White, T. 145–46). White did not report either of these incidents to Hill. (L. Hill, T. 3479).

### D. *Shirley Starks*

321. Shirley Starks alleged that she was discharged during her 30 day probationary period.

322. Starks was hired on February 26, 1979 as a part-time food clerk for Store No. 182 (165 Rodney Parham Road). Prior to reporting to Store No. 182 she received three 8-hour days of training at the division office. After completing this training program, her name was removed from the store schedule and she was informed by her husband, who was an assistant manager for Safeway, that she was terminated.

(S. Starks, T. 122–125; Def.Exh. 2C, p. 660).

323. Mike Marcussen was the training instructor for Safeway who operated the training facility at the Division Office. Starks received the normal three day period of training for operation of a conventional mechanical register. Starks had problems with over-rings and refunds, weighing of produce items, computation of sales tax, and operation of the register. Based on these problems, Marcussen recommended to Gerald Mauldin that Starks not be sent to the store to which she had been assigned. (Marcussen, T. 4308–10).

324. Marcussen functioned as Training Instructor for Safeway from September, 1977 through January, 1980. During that period of time Starks was the only employee who failed to perform in three separate areas of training. During this same period of time Starks and a white female were the only two persons who were not sent from the training program to the store to which they had been assigned. Marcussen described Starks' situation as being very unique in that when she was in the check stand she almost changed personalities. Marcussen was not sure if it was the register operations which confused Starks, but that there were definite problems in the check stand in these three areas. Marcussen was very concerned about the problems which Starks had in the training sessions since her husband, Steven Starks, was an assistant manager for Safeway. For that reason, Starks was personally contacted when it was determined that Starks would not be sent to the store. (Marcussen, T. 4324, 4327, 4335).

325. Prior to her employment at Safeway, Starks was employed at Skaggs for a period of five months. She was discharged and told that the reason for the discharge was that she was not reliable. (S. Starks, T. 127).

326. The Court finds that the evidence supports Safeway's position that Starks was terminated for non-racially motivated business reasons.

### E. *Pervis Lloyd*

327. Pervis Lloyd alleged that he was discharged during his probationary period. Lloyd was employed at Store No. 179 (1919 West 12th) as a courtesy clerk on July 10, 1979 and was terminated on August 1, 1979. (Def.Exh. 2BG, p. 438). According to Lloyd's own testimony, he was involved in a non-work-related motorcycle accident two weeks after he began his employment at Safeway. He returned to work nine days after the accident and was unable to perform the assigned work. Lloyd was informed by his Store Manager Wayne Ward that he was discharged since it would take some time for his shoulder to heal. Lloyd admitted that it did take one month to recuperate from the accident. (Lloyd, T. 160–62, 167).

328. Lloyd's non-work-related injury prevented him from being available to perform the job duties of his position. Since Lloyd would not have recuperated prior to the expiration of his thirty-day probationary period, Safeway would not have had a sufficient period of time in which to evaluate Lloyd's performance.

329. The Court finds that Lloyd's termination was not related to his race.

### F. *William Camp*

330. William Camp alleged that he was discriminatorily discharged during his probationary period. Camp was hired as a courtesy clerk at Store No. 258 on September 14, 1979. He was terminated on September 23, 1979. (Def.Exh. 2A, p. 111).

331. Camp testified that he was terminated by Store Manager Don Goens when he called in to inform Goens that he would be late for work since he had had car trouble and was getting a ride with a friend. (Camp, T. 4755–56).

332. Since Camp had already been late on several prior occasions, Goens terminated Camp. Camp was informed by Goens that due to Camp's transportation problems Goens did not think things were going to work out and reminded Camp that when he had been hired, he (Camp) had stated that

he did have adequate transportation. (Goens, T. 4032).

### G. *Donald Rose*

334. Donald Rose alleged that he was discharged because of his race. Rose was hired by Safeway on September 11, 1976 at Store No. 178 (4100 Asher) as a courtesy clerk. He was later promoted to a food clerk. Rose worked in that store under Store Managers Artis McDonald and Mike Brown. (Rose, T. 42–43).

335. Rose alleged that Randy Bettis, a white employee who was a friend of store manager Mike Brown, provoked a fight with Rose. Rose states that within four weeks of the fight, Rose was fired and Bettis was still at the store. Rose alleged that Bettis was transferred from the store only after Rose had been fired. Rose also alleged that he had not been disciplined before he was fired. (Rose, T. 47–50, 56, 79–80).

336. A white employee, Bettis, did indeed start the fight with Rose in the erroneous belief that Rose had something to do with Bettis' tires being slashed. (Rose, T. 46, 95).

337. As a result of the fight, Safeway management, the Union, Rose and Bettis held a series of meetings. After the meetings with the Union, Rose agreed that a transfer of Bettis would be appropriate punishment. (Rose, T. 48–49).

338. However, despite Rose's feelings that a transfer would have been sufficient punishment for Bettis, Safeway not only transferred Bettis but demoted him from head clerk to food clerk on July 30, 1978. (Def.Exh. 2A, p. 50).

339. On August 5, 1978 Rose failed a blind checkers test and received a written warning from Store Manager Brown. On a $20.00 order, Rose rang up six items on the wrong department key, failed to ring up a bottle deposit, and entered two wrong prices on four items resulting in a $.93 loss. After this warning notice, Rose was sent to the Division Office for further training to help him improve his skills. (Def.Exh. 31A, 31C).

340. On October 18, 1978 Rose received a warning notice from Assistant Manager Billy Wilson, a black, for failing to sign his time card. Rose refused to sign the warning letter and the warning was witnessed by Store Manager Brown. (Def.Exh. 31B).

341. On November 9, 1978 Rose received a second warning notice for poor performance on another blind checker's test. On a $19.24 order, Rose again failed to ring up a bottle deposit and misrang the price of ice cream for a total loss of $1.30. Rose was warned that if his performance did not improve, he would be discharged. (Def.Exh. 31C).

342. On November 25, 1978 Rose performed very poorly on yet another blind checker's test. Rose again rang up items on the wrong department keys and misrang the prices on three items. (Def.Exh. 310).

343. Rose was discharged because of his poor performance in the check stand. (Def.Exh. 31A, 31C, 31D).

344. Rose was not discharged as a result of his fight with employee Bettis. Contrary to Rose's allegations, Bettis was demoted and transferred four months before Rose's discharge. Further, Rose did indeed receive three warnings prior to his discharge, two of which were for the same poor performance in the check stand for which he was ultimately discharged.

345. The Court discredits Rose's testimony and finds that he was not discharged because of his race.

### H. *Stephanie Adams*

346. Stephanie Adams testified as a class witness on discrimination. Her claim has been discussed, *supra.* I find that she has not sustained the burden of proving that Safeway has discriminated against her. Her principal complaint when she first testified was that she had not been accepted into the Store Management Training Program. She has now been placed in this program by Safeway.

### I. *Ronald McCollum*

347. Class member witness Ronald McCollum alleged that he was not properly trained in the store management training program because of his race. McCollum was hired by Safeway on July 5, 1968. McCollum was hired as a full-time food clerk. In 1974 or 1975 McCollum was placed into the Store Management Training Program. (McCollum, T. 1049–52).

348. In his testimony Mr. McCollum claimed that after being placed in the Store Management Training Program, he did not receive proper training or a fair chance to succeed in the program. His testimony fails to establish that he was subject to discrimination in the program or that his training differed from that afforded any other white or black in the program. Safeway simply made a permissible business decision that McCollum could not handle a managerial position. I find no evidence that this decision was based on race.

### J. *Judy Smith*

349. Class member Judy Smith was hired as a part-time food clerk in Jonesboro, Arkansas. After Smith requested a transfer to Little Rock, her store manager asked her if she would like a full-time job in Little Rock. Smith said that she would and was subsequently transferred to Store # 131 (2100 Pike) as a full-time food clerk on February 11, 1979. (Judy Smith, T. 1278–81, 1311–13).

350. After her transfer to Store 131, Smith alleged that she began having some problems with Store Manager Bill Wise. However, Smith never alleged this to be on account of her race. Further, each time she had a problem with her store manager, Smith went to the District Manager Ted Mahan, a white, who Smith said took care of the situation. (Judy Smith, T. 1283–84, 1313–14).

351. Smith requested a transfer out of Store Manager Wise's store and was granted a transfer to Store No. 258. (Judy Smith, T. 1285, 1314–16).

352. Smith's major complaints at Store No. 258 were warning notices which she received from Store Manager Don Goens. In particular, Smith alleged that she was given a warning for cursing while white

employees were not given a warning for cursing in the breakrooms. (Judy Smith, T. 1293–1301).

353. After entering the breakroom, in the presence of other employees, and after discovering that Assistant Store Manager Janis Hanle had made a mistake on her schedule, Smith began a verbal tirade against Janis Hanle which included statements that Hanle was "a bitch", that everything Hanle touched she "fucked up", and that she (Smith) would like to "whip her ass". (Judy Smith, T. 1318–19).

354. After admitting these facts on cross examination, Smith further admitted that she was not given a warning letter for cursing, but was given a warning letter for insubordination toward Assistant Manager. Hanle. (Judy Smith, T. 1319–20).

355. Smith also complained about a warning letter she received for being rude to a courtesy clerk. Smith was working the express lane and asked for assistance on the intercom. When a courtesy clerk showed up, Smith took the sack from the courtesy clerk and told the courtesy clerk that she wanted a checker not a sacker. Smith was given a warning for being rude to the courtesy clerk in front of customers and for usurping the responsibility of the Assistant Manager in running the front end. (Judy Smith, T. 1301–03, 1317–18).

356. Smith was given warning notices because of her misconduct, not because of her race. Smith, if anything, has been given preferential treatment during her tenure at Safeway as witnessed by the fact that she was allowed to reclassify from part-time to full-time when she transferred into the Pulaski County Bargaining Unit, despite the fact that she had less seniority than many other part-time food clerks already in Pulaski County, including some of the Intervenors herein.

### K. *Donald Jefferson*

357. Donald Jefferson alleged that he was discriminated against with regard to Store Management Training Program entry, assignment of part-time hours, and movement from part-time to full-time.

358. Jefferson was hired at Store No. 168 (Cantrell and Mississippi) as a part-time courtesy clerk on September 12, 1975. At the time Jefferson was a high school student. He was promoted to food clerk in less than one year. Although Jefferson testified that he held this position for two years before being promoted to a food clerk, the documentary evidence indicates that he was a food clerk prior to May, 1976. Shortly before the date on which the trial of this matter began (March, 1982), Jefferson transferred to Store No. 175 (Levy). (Jefferson, T. 260–65, Def.Exh. 2B, p. 374).

359. Jefferson testified that white employees with less seniority were reclassified to full-time. In support of this allegation, Jefferson testified that Dena Cable achieved her full-time reclassification by entering the Store Management Training Program and at the time she was placed in the program he was not contacted to see if he might be interested. Jefferson did not testify that he was interested in entering the Store Management Training Program or that he was qualified for such entry. Instead, this allegation appears to be aimed at discrimination associated with part-time to full-time reclassification. Cable, along with nine other employees, was placed in the SMTP program from a part-time position. Upon entry into the program, each of these employees was reclassified to full-time. Four of these employees, two black and two white, failed to complete the Store Management Training Program; upon failure to complete the program each employee received a demotion in classification, but the employee retained his full-time status. (Def.Exh. 39; Mauldin, T. 4407–49).

360. Jefferson named eight white employees with less seniority who were reclassified to full-time. Jefferson had personal knowledge of only one of these employees; the other names had been provided to him by his attorney. (Jefferson, T. 272, 298–99). There were also four black employees with less seniority than Jefferson who were reclassified to full-time. All twelve of these employees were reclassified from part-time to full-time for a legitimate rea-

son which is a valid exception to following the Union seniority list. (Def.Exh. 38).

361. Jefferson testified that he was scheduled for less hours than Dena Cable. Jefferson admitted that although he knew he was entitled under the Union contract to more hours than a less senior employee, he never complained to the Union about this scheduling error. (Jefferson, T. 282–84).

362. This case was tried in several different segments. Jefferson testified in the first segment on March 25, 1982. On August 26, 1982 he testified that he had been discriminated against because of his prior testimony. As evidence of this retaliation, Jefferson alleged that he was being watched by Assistant Manager Mike Casey and that he had received a warning letter from Casey for not properly rotating the bread and milk. However, Jefferson admitted that he had not complained about this reprisal to Store Manager Miles Henderson, a black, or filed a grievance with the Union. (Jefferson, T. 2103–06).

363. It is doubtful that Jefferson has even alleged that he was discriminatorily denied entry in the Store Management Training Program. However, assuming that this allegation was made, Jefferson has failed to present any testimony on his qualifications for entry into such program.

364. For each of the eight white employees and 4 black employees who were reclassified to full-time with less seniority than Jefferson, Safeway has articulated a legitimate reason for such reclassification.

### L. *Ray Norris*

365. Ray Norris was originally hired by Safeway on August 17, 1970. He took a military leave of absence for seven years and upon returning reapplied at Safeway. At that time he informed Gerald Mauldin that he had worked in Benton as a part-time employee, had served three years in the service and upon release had reapplied at the Benton store. He said he was informed at the Benton store that there was no job available and thus reenlisted for another four years. Since the Division Office had no knowledge that Norris had reapplied after the first military stint, Norris'

records were destroyed after five years. Norris was reinstated at Store No. 168 (Tanglewood) as a part-time food clerk, given his earlier seniority date and informed that he would be considered for the first full-time vacancy. Although Norris contends that his rehire was discriminatory, this was indeed a unique situation and was not handled on the basis of race. (Norris, T. 1077–80; Mauldin, T. 4403–04). Norris was reclassified to full-time on August 3, 1980 and retained this full-time status until March 1, 1981 when he was reclassified to part-time. This reclassification was due to economic conditions which necessitated reclassification of the least senior full-time employees in the city to part-time and resulted in the layoff of a number of part-time employees. Norris was the least senior full-time employee in his classification and he does not contend that this reclassification has anything to do with his race. (Def.Exh. 40, Mauldin, T. 4404; Norris, T. 1095).

366. When economic conditions became more favorable, Norris was informed that he would be reelevated to full-time. Norris informed Mauldin and Store Manager Charles Downey that he was enrolled in college and thus unavailable to work the five eight-hour shifts which were necessary. Norris informed Mauldin at that time that since he was receiving VA assistance, he could not afford to drop out of college. (Mauldin, T. 4404–05).

367. Norris alleged that Store Manager Downey would not accommodate the store scheduling to Norris' classes and as a result Norris could not attend these classes and flunked out of school. Upon flunking out of school, he notified Mauldin that he was again interested in reclassification to full-time. He was reclassified to full-time at the next vacancy. (Mauldin, T. 4405).

368. Norris named five persons whom he alleges were reclassified to full-time with less seniority than he: Dianna Miller; Joanne Bramel; Wanda Cable; Don Carter; and Irving Baughman.

369. Dianna Miller was hired on September 18, 1978 into a full-time position at the opening of Store No. 258. Miller had nine years experience with various florists. Additionally, at the time Miller was hired, Ray Norris had not returned to Safeway from his military service. (Def.Exh. 38).

370. Joanne Bramel was hired on April 16, 1981 as a part-time floral clerk. On September 26, 1981 she was the most experienced part-time floral clerk available for a full-time position at Store No. 274. (Def. Exh. 36).

371. Irving Baughman, white, and Don C. Carter, a black, were both assigned to Store No. 4011 as night stockers. Both received 40 hours per week for a period of four consecutive weeks and as a result became full-time by operation of the contract. (Def.Exh. 36).

372. Wanda Cable was hired on July 16, 1979 as a floral clerk. When a full-time floral clerk position became available on July 26, 1981, Cable was the most senior part-time floral clerk in the city. (Def.Exh. 36). Norris did not introduce any evidence of his qualifications to be a floral clerk and the Court finds that he was not so qualified.

373. Several witnesses testified to alleged retaliation for their earlier testimony. The Court ruled that this testimony was insufficient to issue an injunction against Safeway but ruled that Norris' testimony on retaliation would be considered in connection with the entire case. (Norris, T. 2116). Norris alleged that he had been cursed out by Produce Manager Chuck Bridges. Norris did not file a grievance with the Union but did complain to his District Manager Pat Beardon. As a result of Norris' complaint, Gerald Mauldin investigated the incident and determined that Bridges' conduct was not racially motivated. However, Bridges has been demoted and transferred from Store No. 144. (Mauldin, T. 4436).

374. Norris alleged that he had received less hours than employees with less seniority. Norris reported this to the store management and also to the Union. The Union

has taken no action. (Norris, T. 2081). It was pointed out to Norris by management that he was not scheduled less hours than other employees but that some employees had worked more hours due to the fact that Norris did not have a telephone where he could be reached for call-in unscheduled hours. (L. Hill, T. 3504–05; 3658).

375. Norris alleged that an employee from Store No. 168, John Gathright, rather than Norris had been scheduled to relieve the Produce Department Manager. The District Manager explained to Norris that he had made arrangements for Gathright to relieve the Produce Manager when the Produce Manager went on vacation. Gathright had previously worked at Store No. 144 and has twenty-five years seniority at Safeway and prior experience as a produce manager. (L. Hill, T. 2081–82; Def.Exh. 2A, p. 256).

376. Norris testified that the garbage disposal was "locked on him" when he came to work, but was not locked on the white employee who worked the produce one day a week. The garbage disposal had been locked for a period of two weeks to prevent the night produce employee from throwing away produce in an attempt to correct a problem in the store with produce inventory shortage. Two persons were scheduled to work the produce. Monday through Fridays, one employee got off at 3:30 p.m. and the second employee came on at 4:00 p.m. The produce manager locked the disposal after the day employee left. On Saturday the first employee works until 3:30 p.m. and the second one comes on at 2:00 p.m. so there is an overlapping period with two employees in produce. The produce manager had simply forgotten to lock the garbage disposal on this particular day that the white employee worked. (L. Hill, T. 3505–07).

377. Norris alleged that he had been scheduled as few as three hours at one time and that the Union contract provided that a minimum of four hours must be scheduled at one time. Norris was a college student and the Union contract provides that a student may be scheduled for

less than the minimum four hours. (Def. Exh. 11, 12, 13).

## M. *Otha Harris*

378. Otha Harris, a class member witness, alleged that he was discriminated against with regard to the number of hours assigned, denial of opportunity to work a second job while employed at Safeway and with regard to a disciplinary warning received. (Harris, T. 1358–80).

379. Harris was hired as a part-time courtesy clerk on February 5, 1979 at Store No. 229 (Benton). On September 23, 1979 Harris transferred to Store No. 258 (Geyer Springs Road) for the opening of the new super store. (Harris, T. 1360–61).

380. While at Store No. 258, Harris received a warning letter from store manager Don Goens for eating potato chips while he was attending the pick-up service station. Goens counselled with Harris and after this one warning, Harris' performance improved dramatically. As a result Goens recommended Harris to his District Manager for a promotion to food clerk at the Food Barn. (Goens, T. 4042–43).

381. On July 13, 1980 Harris transferred to Store No. 4006 (North Little Rock Food Barn). He was scheduled approximately 29 to 39 hours weekly at Store No. 4006. Harris, who lived in Little Rock, and a white employee at Store #4011 (Little Rock Food Barn) who lived in North Little Rock asked and were allowed by Safeway to switch jobs. After this transfer, Harris was receiving approximately 20 to 29 hours weekly at Store #4011. Hours are scheduled by store according to seniority. (Harris, T. 1362–63, 1369–70).

382. Harris' scheduled hours at 4011 dropped from approximately 20 to 29 to a low of 8 hours per week. During this time the business at the North Little Rock Food Barn had decreased drastically and all part-time employees' hours were being reduced. Harris does not allege that the reduction in hours was due to race. (Harris, T. 1370–1372). When Harris' part-time hours decreased, he requested permission to obtain a second job in addition to his job at Safeway. This request was denied by store

manager Clay Polston and as a result, Harris resigned his employment. Harris admitted that he knew of both black and white employees who were allowed to have a job in addition to their Safeway job but that he knew of no employee at #4011 who had two jobs. (Harris, T. 1364–65, 1371–73).

383. The Court finds that Harris failed to prove any of the actions taken toward him were race related.

## N. *Charles Waits*

384. Class member witness Charles Waits has been employed by Safeway since 1964. (Waits, T. 1323–26).

385. Waits testified that he had been demoted from a produce manager to a food clerk. (Waits, T. 1338). Waits admitted that as a produce manager in Store No. 217, he was having trouble keeping the produce on the racks fresh and that he was having to throw away produce. (Waits, T. 1340–41). Waits further testified that District Manager Ted Mahan told him he was being demoted because the "disappearance" rate was too high.

386. Waits alleged that he did not know whether he was demoted because of his race or not. (Waits, T. 1352). Waits affirmed that he was told he was demoted because of his performance as a produce manager. (Waits, T. 1352). Waits also admitted that several white produce managers had been demoted and that the produce manager job was a very high risk position. (Waits, T. 1352).

387. Waits was demoted because of his work performance as a produce manager at Store No. 217. During this same period of time, five white produce managers were also demoted. (Def.Exh. 50).

388. The Court finds that Waits failed to prove that the demotion was because of his race.

## O. *Melvin Pride*

389. Melvin Pride alleged that he was subjected to racial slurs from customers and employees at Store No. 182 (165 Rodney Parham Road). He also alleged that

although he was hired as a food clerk he was assigned cleaning duties.

390. Pride was hired as a full-time food clerk in 1971. He obtained this position through OIC, an organization which attempts to place black persons in certain employment areas. Pride worked at Safeway for approximately 3 months and has had no employment relationship with Safeway since that time. (Price, T. 1977–78, 1985).

391. Any allegations made by Pride with respect to his employment relationship at Safeway are outside the relevant time period for purposes of this action. However, his testimony does reveal that Safeway was pursuing its affirmative action plan in hiring in 1971.

392. Pride testified that he witnessed an incident involving a black customer and a white checker at Store No. 179 (12th and Lewis). From Pride's description of the incident, it appears that the customer was approached by Safeway employees who suspected her of shoplifting. In any event, such allegations have no relevance in an employment discrimination action.

### P. *Leslie Murphy*

393. Leslie Murphy, a class member witness, was hired at Store No. 172 on July 18, 1977 as a part-time courtesy clerk. He was promoted to part-time food clerk on October 16, 1977. Murphy was reclassified to full-time produce clerk on May 4, 1980. Murphy testified that he had been reassigned from stocking duties to checking duties at the direction of Assistant Manager Janis Hanle who said he was incompetent. Murphy admitted that all he was qualified to do was check. (Murphy, T. 4653). Both stocking and checking are functions of a food clerk classification and both receive the same pay. (Mauldin, T. 4349–50).

394. Murphy alleges that he was beaten by white employees and that these employees were not disciplined. An altercation did occur between Murphy and Perry Black on April 3, 1979 at Store No. 212. Murphy was observed by Perry Black taking something out of his register, placing it in his

pocket and proceeding to the back of the store to clock out. When Murphy was asked by his supervisor to show him what he (Murphy) had placed in his pocket, Murphy refused and began to chew up what he had placed in his pocket. When Black attempted to see what Murphy had placed in his mouth, a scuffle issued. Assistant Manager Hanle broke up the employees, and Murphy spit chewed up coupons out of his mouth. Safeway's security department investigated the incident and found that Murphy had $300.00 in his pocket but that there was no shortage on his cash register. (Murphy, T. 4658–59; Hanle, T. 3962–68; Mauldin, T. 4586–93).

395. As a result of this altercation, Murphy filed a lawsuit and workers' compensation claim. This claim was settled by joint petition and Murphy was allowed to transfer to a Safeway store in his home town, El Dorado. A grievance was filed by four laid off employees at the El Dorado store protesting Murphy's transfer. As a result of this grievance, Murphy was transferred back to Little Rock and assigned to Store No. 199 (Rose City) and reclassified as a full-time food clerk. (Mauldin, T. 4592; Murphy, T. 4666–67).

396. I find no evidence that Murphy was subjected to discrimination by Safeway.

### CONCLUSIONS OF LAW

#### I. JURISDICTION

1. This court has jurisdiction under 28 U.S.C. §§ 1343(3) and (4), 2201 and 2202, and 42 U.S.C. § 1981.

2. The Plaintiff and Intervenors' claims under 42 U.S.C. § 2000e have been dismissed.

3. Since there is no specifically stated or otherwise relevant federal statute of limitation for a cause of action under 42 U.S.C. § 1981, the relevant period is controlled by the most appropriate statute under state law. *Johnson v. Railway Express Agency*, 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975). The

Eighth Circuit has ruled that the appropriate Arkansas statute of limitation is Ark. Stat.Ann. § 37–206 which provides for a three-year limitation period. *Clark v. Mann,* 562 F.2d 1104, 1112 (8th Cir.1977). The instant action was filed on January 30, 1980, and therefore the relevant time period of this lawsuit is January 30, 1977 to the present. *Marshall v. Kirkland,* 602 F.2d 1282, 1286 (8th Cir.1979).

4. This lawsuit alleges both individual and class-wide racial discrimination by Safeway Stores, Incorporated (Safeway) against its black employees.

## II. DISPARATE TREATMENT

■ 5. In an action alleging class-wide disparate treatment, plaintiffs must establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure— the regular rather than the unusual practice. *International Brotherhood of Teamsters v. U.S.,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977). In proving a disparate treatment case, the order of proof and the burden of persuasion, as well as the burden of proof on the ultimate issue of racial discrimination, are the same under Title VII and § 1981. *Person v. Alberici Constr. Co.,* 640 F.2d 916, 918 (8th Cir.1981); *Gilbert v. City of Little Rock,* 544 F.Supp. 1231, 1236 (E.D.Ark.1982). *See also Paxton v. Union National Bank,* 688 F.2d 552, 567–68 (8th Cir.1982).

6. Plaintiffs can produce anecdotal evidence, both direct, if available, and circumstantial, and statistical evidence in order to prove their case.

> ... [T]he focus of the judicial inquiry must be whether plaintiff has proven by a preponderance of the evidence from facts from which the court must infer, absent rebuttal, that the defendant was more likely than not motivated by a discriminatory animus.... [T]he Court must make a sensitive inquiry into the direct and circumstantial evidence of discrimination offered by the plaintiff in order to determine if the facts so proved

allow a legally permissible inference of discriminatory intent.

*Gay v. Waiters Union Local 30,* 694 F.2d 531, 538 (9th Cir.1982).

■ 7. Once plaintiffs have presented facts sufficient to justify an inference of intent to discriminate, the burden of production, but not the burden of persuasion, shifts to the defendant to rebut the plaintiff's case by either discrediting the plaintiff's statistics by coming forth with a more probative statistical analysis, *Coble v. Hot Springs School District,* 682 F.2d 721 (8th Cir.1982); or by presenting admissible evidence of non-discriminatory reasons for the alleged discriminatory action. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). Once defendant has presented such rebuttal evidence, the plaintiff's case will fail unless the plaintiff persuades the court that the defendant's reasons were pretextual.

8. In dealing with class disparate treatment claims the employer can meet a *prima facie* case, whether supported by statistics or anecdotal evidence, by explaining legitimate non-discriminatory reasons for each of the individual employment decisions. It is then incumbent upon the plaintiff to prove that the given reasons are pretextual in at least enough instances that the Court could find a pattern and practice of racial discrimination against blacks as a class. Absent such rebuttal, a plaintiff cannot meet its ultimate burden of persuasion. *Paxton v. Union National Bank, supra* at 567–68.

9. Since plaintiff carries the burden of persuasion throughout a disparate treatment case, once all the evidence is in, the court should focus on the ultimate issue of whether plaintiff has proven by a preponderance of all the evidence that the defendant intentionally discriminated against the class or the individual. *United States Postal Service Board of Governors v. Aikens,* —— U.S. ——, ——, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403, 31 FEP cases 609, 611 (1983).

10. All parties herein stipulated to the class issues, framing those class issues in classic disparate treatment allegations: "All black employees of defendant ... who may have been subject to racially discriminatory treatment ..." with regard to certain employment practices in the areas of promotion, obtainment of full-time status, number of hours assigned, training for management positions, discharges, shift assignment, working conditions, and being subjected to racial harassment.

11. Neither the Complaint nor any of the petitions for intervention nor any of the evidence presented contains an allegation that Safeway has treated blacks and whites alike under a neutral policy, but that the policy has had a discriminatory impact upon blacks as a race.

12. It is clear that this class action was brought as a disparate treatment action under Title VII and § 1981 and the Court so finds. Even though the Title VII portion of the lawsuit was dismissed for failure to join an indispensable party, the parties have stipulated that the issues to be decided by this court would have been the same even if the Title VII action had not been dismissed. (Stipulated Order, February 23, 1982).

## III. CLASS ISSUES

### A. *Statistical Testimony*

13. The Court finds that Safeway has adopted an appropriate Affirmative Action Plan which is designed to enhance the employment opportunities of blacks and other minorities in Pulaski County. Neither Title VII nor § 1981 requires that an employer adopt such an affirmative action plan. Executive Order 11246 mandates not only non-discrimination, but also affirmative action as well. Title VII and § 1981 mandate only non-discrimination.

14. The only resemblance of a statistical analysis offered by the Plaintiff and Intervenors in this case is the deposition and exhibits of Mr. Martin Mador. Mador stated that he prepared the exhibits from Dr. Welch's data base, the integrity of which he accepted.

15. Mador admitted that he was not familiar with any of Safeway's employment practices. Further, Mador also admitted that there were errors in his exhibits and that all of his exhibits were over-inclusive in that they included a number of non-class members.

16. After examining Mador's exhibits, Dr. Welch noted the errors in the exhibits, the over-inclusive nature of the exhibits, and the fact that the rankings that Mador used as a basis for some of his exhibits were inappropriate. Welch also stated that Mador's exhibits represented only a beginning step in a statistical analysis and that no valid statistical analysis could be drawn from the exhibits as presented by Mador. Dr. Richard Goldstein, the Plaintiff and Intervenors' third expert witness, in his deposition, would not and could not dispute Welch's criticism of Mador's exhibits. Dr. Goldstein concurred with Dr. Welch that no valid statistical analysis could be derived from Mador's exhibits.

17. The only statistical evidence presented by Plaintiff and Intervenors is of no assistance to this Court in finding or not finding discriminatory impact or treatment. Consequently, Plaintiff and Intervenors' allegations of class discrimination must be measured solely by Plaintiff and Intervenors' anecdotal evidence.

18. Safeway's expert witness, Dr. Welch, went to great lengths to prepare and assure the integrity of the data base he constructed from the information supplied to him by Safeway. The Court is satisfied that the data base as prepared by Dr. Welch is an accurate reflection of Safeway's personnel and payroll records.

19. Dr. Welch also went to great lengths to assure that all job groupings for his analyses were appropriate. The Court is also satisfied that Dr. Welch's job groupings are appropriate.

20. Plaintiff and Intervenors made no effort to challenge by any relevant evidence, expert or otherwise, Dr. Welch's

data base or his job groupings. The only mention from Plaintiff and Intervenors' witnesses can be gleaned from the depositions of Mr. Mador and Dr. Goldstein and both expressly refused to criticise Welch's conclusion or his data base.

### B. *Promotions*

21. While Intervenors Doby and Nowden and class member witness Adams presented testimony that they were denied promotions, a number of other class members testified to having received a number of promotions. Further, Safeway presented a valid statistical analysis concerning promotions to particular job classifications (through appropriate analyses for large number and small number situations) and concerning the aggregate of all promotions.

■ 22. Based upon the evidence as a whole on the issue of promotions, the Plaintiff and Intervenors have failed to prove by a preponderance of the evidence that Safeway intentionally discriminated against black employees as a class. To the contrary, Defendant Safeway has proven by the overwhelming weight of the evidence that Safeway does not discriminate against blacks in the area of promotions.

### C. *Reclassification from Part-Time to Full-Time Status*

23. Intervenor Nowden and class member witnesses Adams, Jefferson, and Norris identified certain white employees as having attained full-time status with less seniority than the respective witnesses.

24. Safeway responded to the class witnesses' proof that whites were made full-time over them by proof that some blacks were also made full-time over them. Safeway then explained legitimate, non-discriminatory circumstances in which a less senior part-time employee may attain full-time status over a more senior part-time employee: Working 40 hours for 4 consecutive weeks; promotion to another classification where there are no part-time jobs; or being a new hire into a position where there are no part-time jobs. Safeway then provided admissible evidence articulating a reason

for each and every instance in which an employee with less seniority was made full-time over Nowden, Adams, Jefferson, or Norris. It was then incumbent upon these witnesses to prove that the given reasons were pretextual in at least enough instances so that the Court could find a pattern or practice of discrimination against blacks. *Paxton v. Union National Bank, supra.* This the Plaintiff and Intervenors failed to do.

25. Safeway also provided valid, meaningful statistical analysis proving that there is no statistically significant evidence that blacks were less likely than white employees to be reclassified to full-time status.

■ 26. Based upon the evidence as a whole, on the issue of reclassification from part-time to full-time status, Plaintiff and Intervenors have failed to prove by a preponderance of the evidence that Safeway intentionally discriminated against blacks as a class on this issue.

### D. *Full-Time New Hires*

27. Intervenor Nowden and class member witnesses Adams and Jefferson identified some white employees who were hired full-time while the respective witnesses were part-time, seeking full-time status.

28. Safeway responded by articulating legitimate non-discriminatory circumstances in which an employee may be hired into full-time status, even though other part-time employees are seeking full-time status: If no part-time employee is available, as in the case of a night stocker position, or if the opening is in a classification that has no part-time positions, then Safeway can either promote an employee into the position or hire a new employee from the outside. Safeway primarily hires from the outside when they are in need of someone with special skills. Plaintiff and Intervenors did not prove any of these reasons to be pretextual.

29. Safeway then articulated the reason for each and every full-time new hire by

introducing employment records which showed the reasons why each of these employees was hired into a full-time position. It was then incumbent upon the Plaintiff and Intervenors to prove that the given reasons were pretextual in at least enough instances that the Court could find a pattern and practice of discrimination against blacks. *Paxton v. Union National Bank, supra.* Plaintiff and Intervenors failed to prove any of the reasons were pretextual and therefore did not meet their burden.

■ 30. Based upon the evidence as a whole, on the issue of full-time new hires, the Plaintiff and Intervenors have failed to prove by a preponderance of the evidence that Safeway intentionally discriminated against black employees as a class.

### E. *Reclassification from Full-Time to Part-Time Status*

31. Plaintiff and Intervenors' sole proof of class discrimination against blacks in reclassification from full-time to part-time status consisted of the testimony of Intervenor Nowden that she was discriminatorily reclassified to part-time status on September 28, 1980 and March 1, 1981.

32. Safeway responded by introducing evidence of legitimate non-discriminatory circumstances in which an employee can be reduced from full-time to part-time status: Voluntarily or through a reduction in force. An involuntary reduction is done within classifications by date of full-time seniority.

33. The evidence indicates that when Intervenor Nowden was reclassified from full-time to part-time status on September 28, 1980, there were three other food clerks in Pulaski County with less full-time seniority that nonetheless retained their full-time status—two whites and one black. Defendant Safeway explained that all three of these employees who were not reclassified, while working in the classification of food clerk, were performing night stocking functions while Intervenor Nowden was performing a checker function. Whether Nowden's reduction was a violation of the Union contract or not is not for this court

to decide. It is highly improbable that this decision was based upon race, given that one of the three preferred night stockers was also black. The decision was more probably based upon the functions of the job: Night stockers vis-a-vis a checker. Even if this is found to be a violation of the Union contract, a contract violation is not equivalent to racial discrimination. Further, upon the filing of a grievance Ms. Nowden was again reclassified to full-time.

34. Intervenor Nowden's claim that she was discriminatorily reclassified on March 31, 1981 is discredited by class member witness Norris who was also reclassified to part-time status on March 1, 1981. Norris testified, as did Employment Relations Manager Mauldin, that the reclassification was due to economic conditions and was not discriminatorily motivated. Further, the uncontroverted evidence shows that Nowden and Norris were indeed the least senior full-time food clerks at the time of their reclassification to part-time status. A reclassification due to a business slowdown and carried out on the basis of seniority is not unlawful. *Taylor v. Teletype Corp.,* 475 F.Supp. 958, 970 (E.D.Ark.1979).

35. Dr. Welch did some analysis of the facts at issue though he performed no statistical analysis. According to Dr. Welch, a study of the facts surrounding all of the reductions from full-time to part-time status indicates that in the vast majority of instances the person reduced had the least full-time seniority. It would be fair to infer that voluntary reclassification to part-time status is the cause of at least some of the remaining reclassifications. Plaintiff and Intervenors' evidence did not controvert this assumption in any way. The Court's review of the testimony and exhibits pertaining to this issue leads it to the same conclusion reached by Dr. Welch. Race played no part in the transfer of Safeway employees from full-time to part-time status.

■ 36. Intervenor Nowden's testimony, standing alone, falls far short of the proof necessary to establish a pattern or

practice of racial discrimination (intentional or otherwise) against blacks in the reclassification from full-time to part-time status. Plaintiff and Intervenors have simply failed to prove by a preponderance of the evidence that Safeway discriminated against black employees in this regard.

### F. *Assignment of Part-Time Hours*

37. Intervenors Nowden and Doby presented the only specific evidence that less senior white employees were given more hours than they were given. According to these witnesses, the less senior white employees were scheduled for fewer hours, but Safeway gave these employees unscheduled call-in hours which resulted in the less senior employees obtaining more hours of work in the week than Nowden or Doby.

38. Safeway provided evidence of legitimate non-discriminatory circumstances in which less senior part-time employees could get more hours than more senior part-time employees: Non-scheduled work hours are offered to the most senior available part-time employees. If the employee is not available (e.g., not at home when called, unwilling to accept the hours, already scheduled to work during that period of time), then the store manager will call a junior employee to work the call-in hours. In this manner, less senior employees, though scheduled fewer hours, sometimes end up with more hours at the end of the week than other more senior employees. Plaintiff and Intervenors have failed to prove this explanation to be pretextual.

39. Safeway also proved that although some white employees with less seniority may have gotten more hours than Nowden or Doby, each of these two witnesses both got more hours than some senior white employees in their classification. This is not consistent with a finding that Safeway engaged in class type discrimination against blacks in the assignment of part-time hours, but is consistent with what one would expect to find in a normal work force where differences do occur without regard to race.

40. Safeway also presented an extensive and impressive statistical analysis of the number of hours worked by part-time employees at Safeway, including a multiple regression analysis which demonstrated that race was not a statistically significant factor in explaining the number of hours worked by part-time employees.

■ 41. Based upon all the evidence as a whole on the issue of the assignment of part-time hours, Plaintiff and Intervenors have failed to prove by a preponderance of the evidence that Safeway discriminated against blacks as a class intentionally or otherwise. To the contrary, once again, the overwhelming weight of the evidence proves that Safeway does not discriminate against blacks in the assignment of part-time hours.

### G. *Relatives*

42. Plaintiff and Intervenors allege that relatives of white employees receive favorable treatment in areas of promotion, reclassification from part-time to full-time status, and the assignment of part-time hours. Plaintiff and Intervenors' proof consisted of general allegations, lacking of any proof of qualification or seniority of either the preferred white relative or the black employee who was allegedly discriminated against.

43. Safeway indicated that it likes to hire relatives of employees as they are an excellent source of new employees. Employment Relations Manager Mauldin testified that this is true of black and white employees. Both parties introduced lists of white and black employees who have relatives working at Safeway.

44. Even presuming that relatives of employees are given preferential treatment, they receive preferential treatment over all other employees—both black and white.

45. The Court concludes that Safeway might well give preference to relatives since many are employed, but Plaintiff and Intervenors have failed to prove by a pre-

ponderance of the evidence that the preferences are limited to white relatives.

■ 46. Based upon the evidence as a whole, Plaintiff and Intervenors have failed to prove by a preponderance of the evidence that Safeway gives preferential treatment to relatives of white employees in order to discriminate against black employees.

## H. *Discharges*

47. Safeway's expert, Dr. Welch, and Plaintiff and Intervenors' expert, Dr. Goldstein, both agreed that it was appropriate, in analyzing the discharge issue, to analyze probationary employees separately from post-probationary employees. This is due to the fact that different criteria and standards are applied to probationary employees than are applied to post-probationary employees.

### 1. *Post-Probationary Discharges*

48. Plaintiff and Intervenors' only proof of class-wide discrimination against black employees who completed their probationary period was through the testimony of Plaintiff Charlotte McDowell and class member witness Donald Rose. In each of these two cases, Safeway came forth with legitimate non-discriminatory reasons for their discharge, which Plaintiff and Intervenors did not prove to be pretextual.

49. In addition, Safeway articulated a reason for each and every discharge of post-probationary employees, both black and white, by introducing admissible employment records and testimony of store managers, giving the reason why each and every employee with more than 30 days seniority had been discharged. The reasons were varied and included dishonesty, excessive tardiness and absenteeism, and unsatisfactory work performance. It was then incumbent upon Plaintiff and Intervenors to prove that the given reasons were pretextual in at least enough instances that the Court could find a pattern or practice of race discrimination against blacks in its discharge practices.

50. Safeway also presented statistical analysis to prove that there is no statistically significant difference between blacks and whites who are discharged in their post-probationary period.

■ 51. Based upon the evidence as a whole, Plaintiff and Intervenors have failed to prove by a preponderance of the evidence that Safeway intentionally discriminated against blacks by discharging blacks in their post-probationary period.

### 2. *Probationary Discharge*

■ 52. Plaintiff and Intervenors' proof on the issue of whether Safeway discriminated against blacks by discharging them during their probationary period consisted of six employees who testified that they were discharged during their 30-day probationary period. For each of these six employees, and indeed for all 60 employees who were discharged in Pulaski County from January, 1977 through 1981, Safeway articulated a reason for each and every discharge of both black and white employees by introducing admissible evidence with employment records and testimony of store managers, which set forth the reasons why each employee had been discharged. The reasons were varied and included poor performance, inability to perform job functions, laziness, lack of enthusiasm, etc. There was no racial pattern for the listed reasons. Based upon the totality of the evidence presented in this case, the Court finds it unreasonable to infer racial discrimination in Safeway's probationary discharge practices based either solely upon Dr. Welch's analysis of this issue, or upon the coupling of Dr. Welch's statistical analysis with the Plaintiff and Intervenors' other anecdotal evidence in this case. To the contrary, Safeway satisfied to the letter the requirements of *Paxton v. Union National Bank, supra* with regard to responding to a *prima facie* case of disparate treatment. Plaintiff and Intervenors on the whole failed to then meet their burden of proving that the reasons so presented were mere pretexts for discrimination.

### I. *Store Management Training Program*

53. Plaintiff and Intervenors' evidence that Safeway discriminates in the administration of its SMTP consists of Intervenor Nimmer's and class member witness McCollum's testimony that they did not get appropriate training while in the SMTP, and class member witness Adams who testified she was not placed into the SMTP despite her qualifications.

54. Perhaps the most damaging rebuttal to Plaintiff and Intervenors' anecdotal evidence on this issue is the large number of black witnesses that Plaintiff and Intervenors called who were steered into the SMTP by white supervisors, who were adequately trained by white supervisors, and who successfully completed the SMTP: Billy Wilson, Miles Henderson, Marion King, Sam Bryant, Jessie Smith and James Smith. The evidence was also elicited that other blacks also met success in the SMTP: Feryl Barnes, Chris Coleman, and Mitchell Metcalf.

55. Safeway produced evidence of legitimate non-discriminatory reasons for demoting both Intervenor Nimmer and class member McCollum out of the SMTP. Plaintiff and Intervenors did not prove that these reasons were pretextual. Further, Safeway introduced evidence that as soon as they became aware that class member Adams wanted to go into the SMTP, she was placed into the Program.

56. Safeway also produced statistical analysis to prove that there is no statistical difference between blacks and whites who enter the SMTP, who complete the SMTP, and who are subsequently promoted into a management position. The statistics show just the opposite.

57. Based upon the evidence as a whole, Plaintiff and Intervenors have failed to prove by a preponderance of the evidence that Safeway intentionally discriminates against blacks in the administration of the SMTP. To the contrary, the overwhelming weight of the evidence proved that Safeway does not discriminate against blacks in the administration of its SMTP.

### J. *Racial Harassment*

58. Plaintiff and Intervenors have failed to sustain their burden of proof that defendant has been guilty of racial harassment or assigning blacks to more menial tasks or to less desirable stores.

### K. *Conclusion—Class Issues*

59. I conclude that Plaintiff and Intervenors have failed to carry their ultimate burden of proof with regard to their class allegations, both as to each individual class allegation and as to the overall class claims. I conclude that Safeway has not practiced race discrimination on a class-wide basis in Pulaski County, Arkansas, and therefore said claims are dismissed with prejudice in their entirety.

## IV. INDIVIDUAL CLAIMS OF PARTIES

### A. *Charlotte McDowell*

60. Safeway has articulated legitimate non-discriminatory reasons for the discharge of Charlotte McDowell and for the failure to place her in the SMTP.

### B. *John Nimmer*

61. Intervenor Nimmer alleged in his Petition for Intervention that Safeway had discriminatorily denied him proper training in the SMTP and had discriminatorily demoted him out of the SMTP, all because of his race.

62. Intervenor Nimmer has failed to prove by a preponderance of the evidence that he was not given proper training while he was in the SMTP. Indeed, the overwhelming weight of the evidence indicates that Safeway went to extreme lengths to provide Nimmer with training and the opportunities to prove his abilities. Nimmer failed to take advantage of any of those opportunities. Nimmer also failed to prove by a preponderance of the evidence that he was denied proper training while in the SMTP.

63. Intervenor Nimmer did prove that he was demoted from the SMTP. Safeway then articulated a non-discriminatory reason for his demotion: Nimmer had failed to successfully complete any section of his SMTP in the time that he was in that program. Intervenor Nimmer failed to prove this reason to be pretextual. On the contrary, the lengths to which Safeway went to advise Nimmer of his inadequacies and to ensure that he was given repeated opportunities to correct such inadequacies prior to removing him from SMTP support a finding of lack of invidious intent. *Marshall v. Kirkland*, 602 F.2d at 1282, 1294–95.

64. In reaching this conclusion, the Court considered the evidence related to the SMTP introduced relating to the class claims. That evidence does not support a finding that persons were removed from the SMTP because of their race and Nimmer's individual evidence does not justify a conclusion that he was removed because of his race.

65. To the extent that Intervenor Nimmer testified to issues outside the scope of his individual allegations contained in his petition for intervention, the Court has considered the evidence in support of the class claims herein. As all class claims have been dismissed, so too must any claim made by Nimmer outside the scope of his individual allegations of race discrimination contained in his petition for intervention be dismissed.

66. All allegations by Intervenor Nimmer that Safeway discriminated against him, individually, because of his race, are hereby dismissed.

C. *Carmen Smith*

67. Intervenor Carmen Smith alleged in her petition for intervention that she was not properly trained during her probationary period and that she was discharged during her probationary period, all because of her race.

68. Intervenor Smith failed to prove by a preponderance of the evidence that she was not given proper training dur-ing her probationary period. The evidence indicates that she was provided with the same training that all other employees were provided, but that she failed to take full advantage of the opportunities afforded to her. Smith's discharge was not discriminatory, despite her allegation that she was not properly trained. 42 U.S.C. § 1981 does not impose a duty on the employer to train an employee so long as the failure to train does not constitute dissimilar treatment from the training given to whites. *Long v. Ford Motor Co.*, 496 F.2d 500, 505 (6th Cir.1974).

69. Smith did prove that she was discharged during her probationary period. Safeway articulated a legitimate non-discriminatory reason for her discharge: While a probationary employee, Smith was inattentive during training sessions, tardy on occasions, and unable or unwilling to learn the PLU codes. Smith failed to prove these reasons to be pretextual. Safeway was justified in terminating Smith. *O'Neal v. Riceland Foods*, 684 F.2d 577, 580 (8th Cir.1982); *Person v. Alberici*, 640 F.2d 916, 919 (8th Cir.1981).

70. All allegations by Intervenor Smith that Safeway discriminated against her, individually, because of her race, are hereby dismissed.

D. *Cheryl Russ*

71. Intervenor Cheryl Russ alleged in her petition for intervention that Safeway discriminatorily denied her a promotion from courtesy clerk while white employees with less seniority were given these promotions. She also alleged that she was discriminatorily denied certain hours of work.

72. Russ failed to testify and no evidence was offered to support her allegations. Conversely, Safeway proved that Russ's allegations were false. Consequently, all allegations by Intervenor Cheryl Russ that Safeway discriminated against her, individually, because of her race, are hereby dismissed. *E.E.O.C. v. Autumn Leaves Nursing Home*, 521 F.Supp. 1052, 1055 (N.D.Miss.1981).

### E. Linda Nowden

73. Intervenor Nowden alleged in her petition for intervention that she had discriminatorily been denied full-time status, and then discriminatorily reduced from full-time status, all because of her race.

74. In support of her allegation that she was denied full-time status, Nowden identified a number of white employees who obtained full-time status with less seniority than she. Safeway countered with proof that there were also blacks with less seniority than Nowden who were made full-time prior to Nowden. Safeway then articulated a reason for each and every instance in which an employee, black or white, was made full-time over Nowden. It was then incumbent upon Nowden to prove that the given reasons were pretextual. This Nowden failed to do.

75. When Intervenor Nowden was reclassified from full-time to part-time on September 28, 1980, there were three other food clerks in Pulaski County with less full-time seniority than she who nonetheless retained their full-time status. All three of these food clerks functioned as night stockers as opposed to Nowden who functioned as a checker. Two of these night stockers were white and one of the night stockers was black. It is highly improbable that the decision to reclassify Nowden was based upon her race, given that one of the three preferred night stockers was also black. The fact that, inadvertently, seniority was not followed to the letter in Nowden's reclassification is not probative of discrimination since a single incident which is an unfortunate but isolated occurrence will not support a charge of discrimination. *Spearmon v. Southwestern Bell Tel. Co.,* 662 F.2d 509, 512 (8th Cir.1981). Further, the fact that the reclassification may have been a violation of the Union contract is not equivalent to nor proof of racial discrimination. Based upon the evidence as a whole, Intervenor Nowden has failed to prove that her reclassification from full-time to part-time status on September 28, 1980 was due to her race.

76. Nowden's claim that she was discriminatorily reclassified to part-time status on March 1, 1981 is totally discredited by class member witness Norris who was also reclassified to part-time status on March 1, 1981. Norris, along with Employment Relations Manager Mauldin, stated that this reduction was due to economic reasons and was not discriminatorily motivated. Both Nowden and Norris were the least senior full-time food clerks when they were reclassified to part-time status. Intervenor Nowden has failed to prove by a preponderance of the evidence that her reclassification from full-time to part-time status on March 1, 1981 was because of her race.

77. With regard to the class issue of part-time hours, Nowden proved that she received less hours than certain white employees with less seniority. Safeway responded by explaining that this occurs when trying to find available employees to work unscheduled call-in hours and that indeed Nowden herself received more hours than some more senior white employees in her classification. Based upon the evidence as a whole, Nowden has failed to prove by a preponderance of the evidence that Safeway has discriminated against her with regard to the assignment of part-time hours.

78. To the extent that Intervenor Nowden testified to issues outside the scope of her individual allegations contained in her petition for intervention, the Court has considered the evidence in support of the class claims herein. As all class claims herein have been dismissed, so too must any claim made by Nowden outside the scope of the individual allegations raised by her in her petition for intervention.

79. All allegations by Nowden that Safeway discriminated against her individually, because of her race, are hereby dismissed.

### F. Gwendolyn Doby

80. Intervenor Doby alleged in her petition for intervention that Safeway discriminatorily reprimanded her, gave her more difficult job assignments, refused to

allow her to transfer out of the deli, and assigned her fewer hours of work than less senior white employees, all because of her race.

81. I find that Intervenor Doby has failed to sustain her burden of proof on these allegations.

### G. *James King*

82. Intervenor James King alleged in his petition for intervention that he was denied a transfer to a truck driving position because of his race and that he was denied a promotion to heavy duty mechanic because of his race.

██ 83. King proved that he was denied a promotion to a truck driver position. Safeway stated (and the Union concurred in a grievance committee hearing) that the Union contract seniority system prohibited employees from transferring from one department (such as truck repair shop) to another department (such as trucking). King failed to prove that the seniority system was tainted by any intent to discriminate against blacks. Absent such proof, King's claim must be dismissed. *Pullman Standard v. Swint*, 456 U.S. 273, 277, 102 S.Ct. 1781, 1784, 72 L.Ed.2d 66 (1982); *American Tobacco v. Patterson*, 456 U.S. 63, 65, 102 S.Ct. 1534, 1535, 71 L.Ed.2d 748 (1982); *Johnson v. Ryder Truck Lines*, 575 F.2d 471, 474–75 (4th Cir.1978).

██ 84. King failed to prove that he was qualified to be a heavy duty mechanic under Safeway's requirements that heavy duty mechanics had to have previous experience in a reputable shop and had to have their own tools. King, by his own admission, had neither. Safeway offered to waive the experience provision (but not the tool requirement) by allowing King to take an aptitude test. King declined. Safeway then agreed to waive both requirements and let King try a 30-day probationary period, after which King was demoted back to serviceman. Safeway articulated a legitimate non-discriminatory reason for the demotion: King's performance during the probationary period was unacceptable due to his poor job performance, his poor diag-

nostic skills, his safety and attendance problems. The Union grievance committee upheld this disqualification. King did not prove any of these reasons to be pretextual. Further, the vacancy that King sought had been filled by a black heavy duty mechanic, George Jackson. King failed to prove, by a preponderance of the evidence, that Safeway intentionally demoted him from his position as heavy duty mechanic because of his race. *Person v. Alberici Constr. Co.*, 640 F.2d 916 (8th Cir.1981); *Jefferies v. Harris County*, 615 F.2d 1025 (5th Cir.1980); *McCarther v. Camelot Inn of Little Rock*, 513 F.Supp. 355 at 373 (D.C.Ark.1981).

85. All allegations by Intervenor James King that Safeway discriminated against him, individually, because of his race, are hereby dismissed.

## V. INDIVIDUAL CLAIMS OF CLASS MEMBER WITNESSES

██ 86. A number of class member witnesses who were neither the Plaintiff nor an Intervenor testified in support of the class allegations herein. Safeway articulated a legitimate non-discriminatory reason for each allegation made by the witnesses, none of which were proven to be pretextual. However, the Court need not make a finding of non-discrimination on these class member witnesses as all class claims have been dismissed. Since these class member witnesses did not seek to intervene, they are not entitled to individual relief in this lawsuit. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 at 361, 97 S.Ct. 1843 at 1867, 52 L.Ed.2d 396; *Clark v. Chrysler Corp.*, 673 F.2d 921, 929 (7th Cir.1982); *Croker v. Boeing Company*, 662 F.2d 975, 997–98 (3rd Cir.1981); *Dickerson v. U.S. Steel Corp.*, 582 F.2d 827, 832 (3rd Cir. 1978); *McCarther v. Camelot Inn of Little Rock*, 513 F.Supp. at 373 (E.D.Ark.1980).